Case No. 26-5303

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA

*Plaintiff—Appellee*


v.


KENTUCKY COUNCIL ON POSTSECONDARY EDUCATION, *et al.*

*Defendants—Appellees*


and


KENTUCKY STUDENTS FOR AFFORDABLE TUITION

*Defendant-Intervenor—Appellant*

_____


On Appeal from the United States District Court for the Eastern
District of Kentucky, Frankfort Division
Case No: 3:25-cv-00028

---

## APPELLANT'S PRINCIPAL BRIEF

---

Thomas A. Saenz
**Mexican American Legal Defense
and Educational Fund**
634 S. Spring Street, Floor 11
Los Angeles, CA 90014
(213) 629-2512
tsaenz@maldef.org

Susana Sandoval Vargas
Olivia Alden
**Mexican American Legal
Defense and Educational Fund**
100 N. LaSalle Street, Suite 1900
Chicago, IL 60602
(312) 224-4340
ssandovalvargas@maldef.org
oalden@maldef.org

Date: July 10, 2026

*Counsel for Appellant*

# CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, the Appellant Kentucky Students for Affordable Tuition makes the following disclosures:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? **No.**

2. Does a publicly owned corporation or its affiliate, not a party to the appeal, have a financial interest in the outcome? **No.**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES 2

STATEMENT REQUESTING ORAL ARGUMENT 6

INTRODUCTION 7

STATEMENT OF JURISDICTION 10

STATEMENT OF THE ISSUES 11

STATEMENT OF THE CASE 12

   I. Factual Background 12

   II. Procedural Background 15

   III. The District Court Opinion 18

SUMMARY OF THE ARGUMENT 21

STANDARD OF REVIEW 23

ARGUMENT 24

   I. The District Court Erred in Entering a Consent Judgment that Contravenes Kentucky Law 24

   A. The Consent Judgment is Not Necessary to Remedy a Violation of Federal Law 24

   II. The Term "State law" Includes Duly Enacted State Regulations 25

     A. PRWORA's Title and Purpose Cannot Contravene Its Plain Language 27

     B. Unrelated Federal Statutes are also Not Instructive 30

     C. Congress Chose "State Law" Over Narrower Terms 33

   III. The District Court's Narrow Construction of Section 1621(d) Violates the Tenth Amendment 34

     A. Kentucky's Choice to Delegate Legislative Power to an Administrative Agency Must Be Respected' 36

CONCLUSION 39

CERTIFICATE OF COMPLIANCE 40

CERTIFICATE OF SERVICE 41

ADDENDUM I 42

# TABLE OF AUTHORITIES

**Cases**

*Alden v. Maine*,
527 U.S. 706 (1999)..........................................................................................37

*Baltimore & Ohio R. Co. v. City of Piqua, Ohio*,
No. C-3-85-312, 1986 WL 8254 (S.D. Ohio June 30, 1986) ................................26

*Beshear v. Acree*,
615 S.W.3d 780 (Ky. 2020) ...............................................................................37

*Campbell v. Univ. of Louisville*,
862 F.Supp.2d 578 (W.D. Ky. 2012)....................................................................34

*Carter v. United States*,
530 U.S. 255 (2000).............................................................................................28

*City of Columbus v. Ours Garage*,
536 U.S. 424(2002)...................................................................................... passim

*Commonwealth v. Biden*,
57 F.4th 545 (6th Cir. 2023) ...............................................................................29

*CSX Transp., Inc. v. City of Plymouth*,
86 F.3d 626 (6th Cir. 1996) ................................................................................27

*Doe v. Ohio State University*,
219 F.Supp.3d 645 (S.D. Ohio 2016) ..................................................................34

*Food Marketing Institute v. Argus Leader Media*,
588 U.S. 427(2019).............................................................................................35

*Frenchko v. Monroe*,
160 F.4th 784(6th Cir. 2025) ..............................................................................26

*Grand Trunk Western R. Co. v. Department of Labor*,
875 F.3d 821 (6th Cir. 2017................................................................................32

*Greenlaw v. United States*,
554 U.S. 237 (2008).............................................................................................25

*Gregory v. Ashcroft*,
501 U.S. 452 (1991).............................................................................................35

*Griffith v. Franklin Cty., Kentucky*,
975 F.3d 554 (6th Cir. 2020) ..............................................................................35

*Hadix v. Johnson*,
228 F.3d 662 (6th Cir. 2000) ........................................................................ 23, 25

*Henry Ford Health Sys. v. Dep't of Health & Hum. Servs.*,
654 F.3d 660 (6th Cir. 2011) ................................................................32

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*,
594 U.S. 382, 388 (2021)...................................................... 25, 28, 30

*Hughes v. UPS Supply Chain Solutions, Inc.*,
677 S.W.3d 273 (Ky. 2003) ..................................................... 28, 37

*Huguley v. General Motors Corp.*,
52 F.3d 1364, 1370 (6th Cir. 1995) .......................................................23

*In re Reinhardt*,
177 F.4th 684 (6th Cir. 2026) .............................................................27

*In re Vargas*, 10 N.Y.S.3d 579 (2015)...................................... 35, 36

*J.B-K. by E.B. v. Secretary of Kentucky Cabinet for Health and Family Servs.*,
48 F.4th 721 (6th Cir. 2022) ...............................................................33

*Jones v. United States*,
529 U.S. 848 (2000).............................................................................35

*King v. Love*,
766 F.2d 962, 966 (6th Cir. 1985) ........................................................27

*Levin v. Miss. River Fuel Corp.*,
386 U.S. 162 (1967).............................................................................26

*Lexington Ins. Co. v. Ambassador Grp., LLC*,
581 F. Supp.3d 863 (W.D. Ky. 2021)......................................... 17, 19

*Lorain NAACP v. Lorain Bd. of Ed.*,
979 F.2d 1141 (6th Cir. 1992) ..............................................................23

*Luna Perez v. Sturgis Public Schools*,
598 U.S. 142 (2023).............................................................................30

*M.L. Johnson Family Properties, LLC v. Bernhardt*,
924 F.3d 842 (6th Cir. 2019) ..................................................... 26, 32

*M.L. Johnson Family Properties, LLC v. Zinke*,
298 F.Supp.3d 1014, 1021-22 (E.D. Ky. 2018)......................................32

*Management Recruiters Intern., Inc. v. Bloor*,
129 F.3d 851, 855 (6th Cir. 1997) ............................................. 21, 32, 33

*Marshall v. Commonwealth*,
719 S.W.3d 53 (Ky. Ct. App. 2025) ......................................................37

*Minnesota v. Clover Leaf Creamery Co.*,
449 U.S. 456 (1981)..............................................................................37

*Nixon v. Missouri Municipal League*,
541 U.S. 125 (2004)..............................................................................37

*Pedreira v. Sunrise Children's Servs., Inc.*,
826 F. App'x 480 (6th Cir. 2020) ................................................................23
*Pulsifer v. United States*,
601 U.S. 124 (2024) ................................................................................33
*Reichert v. Kellogg Co.*,
170 F.4th 473 (6th Cir. 2026) ................................................................31
*Rice v. Vill. of Johnstown, Ohio*,
30 F.4th 584 (6th Cir. 2022) ................................................................38
*Rodriguez v. United States*,
480 U.S. 522 (1987) ................................................................................29
*Russello v. United States*,
464 U.S. 16 (1983) ................................................................................31
*Tennessee Ass'n of Health Maintenance Organizations, Inc. v. Grier*,
262 F.3d 559 (6th Cir. 2001) ................................................................23
*Tennessee v. FCC*, 832 F.3d 597
(6th Cir. 2016) ................................................................................37
*United Auto., Aerospace & Agric. Implement Workers of Am. Loc. 3047 v. Hardin Cnty., Kentucky*,
842 F.3d 407 (6th Cir. 2016) ................................................................ 27, 36
*United Beverage Co. of South Bend, Inc. v. Indiana Alcoholic Beverage Com'n.*,
760 F.2d 155 (7th Cir. 1985) ................................................................38
*United States v. Richardson*,
948 F.3d 733 (6th Cir. 2020) ................................................................28
*Whirlpool Fin. Corp. v. Comm'r of Internal Revenue,*
19 F.4th 944 (6th Cir. 2021) ................................................................28

**Statutes**

8 U.S.C. § 1601 ................................................................................29
8 U.S.C. § 1621(d) ................................................................ passim
28 U.S.C. § 1291 ................................................................................10
28 U.S.C. § 1331 ................................................................................10
29 U.S.C. § 1144(c)(1) ................................................................30
Ky. Rev. Stat. Ann. § 13A.105 ................................................................15
Ky. Rev. Stat. Ann. § 164.020 ................................................................ 13, 38
Ky. Rev. Stat. Ann. § 164.0203 ................................................................7

## Other Authorities

29 Ky. Admin. Reg. 749-751 (September 2002)......................................................13

Jessica Priest, *Confusion reigns as Texas colleges scramble to comply with ban on in-state tuition for undocumented students*, Texas Trib., August 19, 2025, https://www.texastribune.org/2025/08/19/texas-colleges-undocumented-immigrants-tuition-ruling/. ..........................................................................14

STATE LAW, Black's Law Dictionary (12th ed. 2024).......................................25

STATUTE, Black's Law Dictionary (12th ed. 2024)............................................33

## Regulations

13 Ky. Admin. Regs. 2:045 ............................................................... passim

**STATEMENT REQUESTING ORAL ARGUMENT**

Appellant Kentucky Students for Affordable Tuition respectfully requests oral argument. Oral argument is warranted because this case presents this Court with its first opportunity to interpret the scope of 8 U.S.C. § 1621(d). The case also involves important constitutional questions, namely whether (1) the Kentucky regulation is preempted by 8 U.S.C. § 1621(d) and (2) entering a consent judgment to that effect unconstitutionally infringes on the powers reserved to the States under the Tenth Amendment and Kentucky's sovereign authority to organize the structure of its own government. As such, oral argument will help illuminate the positions of the parties and aid the Court in reaching a decision.

# INTRODUCTION

At the end of March, 2026, the members of appellant Kentucky Students for Affordable Tuition (KSAT), as well as numerous other students in Kentucky, faced an immediate obstacle to achieving their education dreams by completing a college or university degree program. The obstacle arose not from the state's normal policymaking procedures, but from a consent judgment between the United States and Kentucky, submitted only shortly after the United States lawsuit challenging longstanding state policy was initiated.

Kentucky wants to increase the percentage of its population with post-secondary degrees. *See* Ky. Rev. Stat. Ann. § 164.0203; § 164.003. To that end, the Kentucky Council on Postsecondary Education ("CPE") promulgated 13 Ky. Admin. Regs. 2:045 § 8(4)(a) ("Section 8(4)(a)") to make a college education accessible regardless of immigration status. For over 20 years, undocumented students have been able, under Section 8(4)(a), to contribute to the state's educational achievement goals.

Although adopted over two decades ago, the Kentucky regulation was promulgated after the federal law -- now asserted to bar the regulation -- was adopted in 1996. In other words, Kentucky officials were fully aware of the federal law when they adopted the challenged policy. Moreover, no presidential administration, including during the first Trump term, had ever asserted, prior to

2025, that policies like Kentucky's, adopted in many different states, somehow run afoul of federal law adopted 30 years ago.

As an administrative agency, CPE exists at the pleasure of the state legislature. CPE adopted Section 8(4)(a) in an exercise of the authority the legislature granted to it. Disagreeing with CPE's choice to do so, the United States sued, asserting, among other things, that a regulation, which has the force and effect of law and was within the authority of the agency to issue, is somehow not a "State law" and therefore does not comply with 8 U.S.C. § 1621(d) ("Section 1621(d)"). The United States is incorrect.

In Section 1621(d), Congress intentionally chose to allow states to grant public benefits to undocumented students through a "State law." The United States cursorily asserted, and the district court agreed, that this use of "State law" means "State statute." That interpretation is belied by Section 1621(d)'s text. If Congress had meant that Section 1621(d) could only be satisfied by a state statute, that is what it would have said. Thus, the district court's order deprives undocumented immigrants who graduated from a Kentucky high school of meaningful access to a college education based on a statutory construction unsupported by the text.

And the district court's acceptance of this construction is even more problematic because the district court's adopted construction of Section 1621(d)

unconstitutionally intrudes on Kentucky's sovereign authority, under the Tenth Amendment, to choose the structure of its own government.

Accordingly, the judgment of the district court should be reversed and the case remanded for further consideration of the United States challenge to the legality of Section 8(4)(a).

**STATEMENT OF JURISDICTION**

The district court had jurisdiction under 28 U.S.C. § 1331. On March 31, 2026, the district court entered its Memorandum Opinion and Order granting Appellees the United States, the Kentucky Council on Postsecondary Education, and Dr. Aaron Thompson's Joint Motion for Entry of Consent Judgment. On April 3, 2026, Appellant Kentucky Students for Affordable Tuition timely filed a notice of appeal of that order and judgment. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in holding that the consent decree was necessary to remedy a violation of federal law.

2.  Whether the district court erred in holding that under 8 U.S.C. § 1621(d) the term "State law" refers exclusively to state statutes or state legislation.

3.  Whether the district court's narrow interpretation of "State law" under 8 U.S.C. § 1621(d) unconstitutionally infringes on the states' power to structure their own governments.

## STATEMENT OF THE CASE

### I. Factual Background

For over two decades, the Commonwealth of Kentucky has allowed eligible students without lawful immigration status to pay tuition equivalent to the rate paid by most students ("regular tuition rates") at public colleges and universities in Kentucky. Appellant Kentucky Students for Affordable Tuition ("KSAT") is an unincorporated association comprised of some of the students who benefit from this law, and those who stand to lose the most as a result of Appellees the United States, Dr. Aaron Thompson, and the Kentucky Council on Postsecondary Education's ("CPE") collusive consent judgment.

KSAT is an unincorporated association whose members attend Kentucky public colleges and universities. Mtn to Intervene, R. 27-1, at PageID # 131-132. It is comprised of students without lawful immigration status who rely on paying regular tuition rates to afford their education—something Kentucky law promised to them for decades. *Id.* KSAT exists for the purpose of promoting, advocating for, and ensuring access to affordable higher education in Kentucky, including maintaining regular tuition rates for certain students without lawful immigration status. *Id*

The Kentucky legislature delegates the authority to "[d]etermine tuition and approve the minimum qualifications for admission to the state postsecondary

educational system" to CPE. Ky. Rev. Stat. Ann. §164.020(8)(a). The legislature's grant of authority to CPE is broad; CPE "[c]onstitute[s] the representative agency of the Commonwealth in all matters of postsecondary education of a general and statewide nature" not otherwise delegated. Ky. Rev. Stat. Ann. § 164.020(21). Exercising that authority, in 1991, CPE's predecessor agency promulgated 13 Ky. Admin. Regs. 2:045 ("Tuition Assessment Regulation"), which establishes the guidelines for determining residency and tuition status at state-sponsored postsecondary institutions. In 2002, CPE amended the regulation to specify that "[a] person shall be a Kentucky resident for the purpose of this administrative regulation if the person graduated from a Kentucky high school and: [i]s an undocumented alien..." 29 Ky. Admin. Reg. 749-751 (September 2002). That amendment is codified at 13 Ky. Admin. Regs. 2:045 § 8(4)(a) ("Section 8(4)(a)").

Since its enactment, Section 8(4)(a) has enabled many immigrant students to afford higher education in the Commonwealth, including members of KSAT. Several KSAT members—like many students without lawful immigration status— come from low-income backgrounds and are not eligible for federal financial aid. This makes paying out-of-state tuition rates particularly difficult. Thus, if the consent judgment is allowed to stand, many, if not all, KSAT members will be forced out of college. *See* Mtn. to Intervene, R. 27-1, PageID # 132. Being priced out of

13

college will lead students like KSAT members to lower-paying jobs, limiting their ability to contribute to Kentucky's economy, including through payment of taxes.

These harms are compounded by uncertainty. Under the terms of the consent judgment, most KSAT members no longer qualify for regular tuition rates. Yet KSAT members have received no communication regarding their tuition status for the upcoming fall semester. There is also no guidance as to how the universities or CPE determine eligibility for students who have types of lawful immigration statuses other than refugees, permanent residents, and visa-holders (e.g. recipients of Temporary Protected Status or Deferred Action for Childhood Arrivals). In states where similar tuition equity laws have been overturned, this has caused mass confusion, and stands to do so here as well.[1]

CPE cannot simply amend the Tuition Assessment Regulation to provide clarity, which it conceded at oral argument. Order, R. 57, PageID # 464. Rather, under Kentucky law, CPE must "promulgate a new regulation" and "put it out for public comment." *Id.* According to CPE, this process is "lengthy" and takes at least six months. *Id.* Both CPE and the United States "represented[ed] that this is the very

---

[1] *See* Jessica Priest, *Confusion reigns as Texas colleges scramble to comply with ban on in-state tuition for undocumented students*, Texas Trib., August 19, 2025, https://www.texastribune.org/2025/08/19/texas-colleges-undocumented-immigrants-tuition-ruling/.

reason they [] moved for entry of a consent judgment." Order, R. 57, PageID # 466. But the consent judgment creates more ambiguity, rather than resolving it.

During the 2025 legislative session, the Kentucky legislature passed the Kentucky Regulations from the Executive in Need of Scrutiny (REINS) Act. *See* Ky. Rev. Stat. Ann. § 13A.105 *et seq.* Under the REINS Act, Kentucky administrative agencies have no authority to promulgate new regulations unless at least one of six criteria is satisfied, subject to certification by the agency and the governor. Ky. Rev. Stat. Ann. § 13A.105(1), (2)(a)-(f), (3). Even if one of these criteria is arguably satisfied here, to codify such an amendment would take months. Transcript, R. 56, PageID # 423-424. Confusion and uneven implementation would reign in the meantime.

## II. Procedural Background

On June 17, 2025, the United States sued Andy Beshear in his official capacity as Governor of the Commonwealth of Kentucky, Robbie Fletcher in his official capacity as Commissioner of Education for the Commonwealth of Kentucky, and CPE to prevent students without lawful immigration status from paying regular tuition rates under the Tuition Assessment Regulation. Complaint, R. 1, PageID # 1-2. Specifically, the United States alleged that 8 U.S.C. § 1623(a) expressly preempts Section 8(4)(a). *Id.* The United States further claimed that Section 8(4)(a) violates 8 U.S.C. § 1621(d) because "Kentucky does not extend eligibility for in-state tuition

15

benefits to individuals who are not lawfully present in the United States through 'a State law' that 'affirmatively provides for such eligibility.'" *Id.* at PageID # 2.

8 U.S.C. § 1621 was passed as part of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"). 8 U.S.C. § 1621(a)-(c) provide that most immigrants without lawful immigration status are ineligible for state and local benefits. Subsection (d), however, provides an exception to that general presumptive rule. It provides:

> A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility.

8 U.S.C. § 1621(d)

On June 23, 2025, the United States filed an amended complaint substituting Defendant Fletcher with Dr. Aaron Thompson in his official capacity as President of CPE. Am. Complaint, R. 4, PageID # 33.

Governor Beshear filed a motion to dismiss on July 15, 2025. Mtn. to Dismiss, R. 11-1, PageID # 68-74. On August 14, 2025, the then-existing parties filed a Joint Stipulation of Dismissal of Governor Beshear (Joint Mtn. to Dismiss, R. 16 PageID # 85-87), which the court granted on August 22, 2025. Order, R. 23, PageID #108-109. That same day, the remaining parties, the United States, Defendant Thompson, and CPE, filed a Joint Motion for Entry of a Consent Judgment declaring that Section

8(4)(a) violates the Supremacy Clause and enjoining CPE, Defendant Thompson, and their successors, agents, and employees from enforcing it. Motion, R. 24, PageID # 112-113; Proposed Consent Judgment, R. 25, PageID # 116. Notably, the proposed consent judgment did not specify under which of the United States' theories of preemption Section 8(4)(a) was preempted. *Id.*

That same day, KSAT moved to intervene in this action to defend Section 8(4)(a) because the existing Defendants declined to defend their own law. Mtn. to Intervene, R. 27-1, PageID # 125-141. Recognizing that "KSAT has alleged facts which demonstrate that it has a direct and substantial interest in this litigation," on November 19, 2025, the district court granted KSAT's motion to intervene as of right under Federal Rule of Civil Procedure 24(a). Order, R. 38, PageID # 299, 303.

On December 17, 2025, the court ordered briefing on the proposed consent judgment. Order, R. 17, PageID #349-350. KSAT filed its response in opposition to the proposed consent judgment on January 9, 2026, (Response in Opposition to Consent Judgment, R. 43, PageID 356-374) and the United States replied in support on January 23, 2026. United States' Reply in Support of Consent Judgment, R. 48, PageID # 384-404. Defendants Thompson and CPE did not reply. On February 5, 2026, the court scheduled oral argument on the Joint Motion for Entry of Consent Judgment to "devote attention to the 'jurisdictional and remedial' intention inherent in entry of a consent decree." Order, R. 52, PageID # 409-410 (quoting *Lexington*

*Ins. Co. v. Ambassador Grp., LLC*, 581 F. Supp.3d 863 (W.D. Ky. 2021)). The court heard oral argument on March 12, 2026. Transcript, R. 56, PageID # 416-453.

### III.   The District Court Opinion

On March 31, 2026, the district court granted the Joint Motion for Entry of Consent Judgment and adopted the proposed consent judgment. Order, R. 57, PageID # 454-475.

The district court held that "the terms of the instant proposed consent decree could not be accomplished outside of litigation, and thus is at odds with state law." Order, R. 57, PageID # 467. The district court recognized that the "United States and the Council could not accomplish what the consent decree asks for – immediate invalidation of the challenged provision of the Tuition Assessment Regulation – absent judicial intervention." Order, R. 57, PageID # 466. Yet the district court entered it anyway, concluding that the proposed consent judgment was necessary to remedy a violation of federal law. *Id.* at PageID #469-475. Specifically, the court held that Section 8(4)(a) violated 8 U.S.C. § 1621(d) because a duly-promulgated regulation is not a "State law" for purposes of the federal statute. *Id.* at PageID # 474.

The United States' Amended Complaint alleged that Section 8(4)(a) was preempted by both 8 U.S.C. § 1623(a) and 8 U.S.C. § 1621(d). Am. Complaint, R. 4, PageID # 35. But, the proposed consent judgment, which the district court

adopted, does not specify under which theory Section 8(4)(a) is preempted. Proposed Consent Judgment, R. 25, PageID # 116. The motion for entry of the consent judgement only mentions 8 U.S.C. § 1623, not Section 1621(d). *Id.* Responding to the United States' cursory mention of 1621(d) in its amended complaint, KSAT addressed Section 1621(d) briefly–in less than 150 words–in its opposition to the motion for entry of consent judgment.

The United States' reply in support of the consent judgment primarily argued that Section 8(4)(a) was preempted by 8 U.S.C. § 1623(a), and dedicated less than three pages to its Section 1621(d) argument. United States' Reply ISO Consent Judgment, R. 48, PageID # 390-391. Appellees CPE and Thompson did not respond at all.

KSAT did not have the opportunity to fully brief the issue; one paragraph was all KSAT had to address the United States' Section 1621(d) argument. The district court held oral argument "to devote attention to the 'jurisdictional and remedial' tension inherent in entry of a consent decree." Order, R. 52, PageID # 409 (quoting *Lexington Ins. Co. v. Ambassador Grp., LLC*, 581 F.Supp.3d 863 (W.D. Ky. 2021). Yet, Section 1621(d) was only mentioned at the very end of oral argument after the district court had asked its questions on the jurisdiction issue. Transcript R. 56, Page ID# 449-450. Thus, the district court entered the consent judgment based on an issue KSAT did not have the opportunity to meaningfully argue or address.

The consent judgment makes students without lawful immigration status categorically ineligible for regular tuition rates. Consent Judgment, R. 25, PageID # 116. KSAT members do not know if they will be able to return to their degree programs in the fall. The United States and CPE achieved this result by agreeing on a consent judgment that does not identify specifically the violation of federal law that supports it.

The district court adopted the consent judgment solely based on its conclusion—largely, as noted, without adversarial party argument—that a duly promulgated state regulation is not a "State law" for purposes of Section 1621(d). Order, R. 57, PageID # 474.

KSAT filed a timely notice of appeal of that order on April 3, 2026. Notice of Appeal, R. 58, PageID # 476-477. This Court has jurisdiction to review KSAT's appeal. 28 U.S.C. § 1291.

## SUMMARY OF THE ARGUMENT

The district court erred in entering a consent judgment that allows the United States and CPE to circumvent the Kentucky legislature and upend a decades-old regulation that has permitted members of KSAT and numerous other students raised in Kentucky to afford a higher education in the state of Kentucky.

The district court based its decision entirely on its narrow construction of the term "State law" under Section 1621(d). But the district court's conclusion that Congress meant state legislation when it identified "State law" did not apply the plain and ordinary meaning of the term under the federal statute. There is nothing so inherently limiting about the term "State law" standing alone. *See Management Recruiters Intern., Inc. v. Bloor*, 129 F.3d 851, 855 (6th Cir. 1997). Because "State law" includes duly enacted regulations, Section 8(4)(a)—a Kentucky regulation with the full force and effect of law—does not violate Section 1621(d). Therefore, contrary to the district court's conclusion, there is no violation of federal law that made the entry of the consent judgment necessary.

The doctrine of constitutional avoidance also compels the conclusion that duly-enacted regulations are a type of "State law" under Section 1621(d). Under the Tenth Amendment, the states retain the sole authority to structure their own governance. Reading Section 1621(d) as a legislative-enactment requirement

21

unconstitutionally infringes on a state's power to delegate authority to its constituent parts. *See City of Columbus v. Ours Garage*, 536 U.S. 424, 429 (2002).

The district court erred in entering a consent judgment based on a strained statutory interpretation that would violate the Tenth Amendment. Its judgment should be reversed.

**STANDARD OF REVIEW**

Generally, a "district court's approval of a consent decree is reviewed for abuse of discretion." *Tennessee Ass'n of Health Maintenance Organizations, Inc. v. Grier*, 262 F.3d 559, 564 (6th Cir. 2001); *Pedreira v. Sunrise Children's Servs., Inc.*, 826 F. App'x 480, 486 (6th Cir. 2020). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Lorain NAACP v. Lorain Bd. of Ed.*, 979 F.2d 1141, 1148 (6th Cir. 1992) (internal quotations omitted). However, for pure questions of law, "the proper standard of review is undeniably de novo." *Huguley v. General Motors Corp.,* 52 F.3d 1364, 1370 (6th Cir. 1995); *see Hadix v. Johnson*, 228 F.3d 662, 660 (6th Cir. 2000) (reviewing partial termination of consent decree *de novo* because the district court's decision rested on question of statutory interpretation).

# ARGUMENT

## I. The District Court Erred in Entering a Consent Judgment that Contravenes Kentucky Law

### A. The Consent Judgment is Not Necessary to Remedy a Violation of Federal Law[2]

The district court's justification for entering the consent judgment was that it was necessary to remedy a violation of federal law. But there is no violation of federal law here. The district court's contrary conclusion is based solely on its incorrect construction of the term "State law" under 8 U.S.C. § 1621(d). Order, R.57, PageID # 470. Against the ordinary meaning of the term, the district court held that Section 8(4)(a)—a Kentucky regulation—is not a "State law," and thus violates Section 1621(d). Order, R.57, PageID # 474. But because the ordinary meaning of "State law" includes duly enacted regulations, Section 8(4)(a) does not violate Section 1621(d).

---

[2] There is also a question as to whether the district court had jurisdiction to enter the proposed consent decree. The parties to the decree "desire[d] precisely the same result," and the Supreme Court has held that in that case there is "no case or controversy within the meaning of Art. III of the Constitution." *Moore v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 47, 48 (1971).

Because there is no violation of federal law, the district court abused its discretion in entering the consent judgment.[3]

## II.     The Term "State law" Includes Duly Enacted State Regulations

Questions of statutory interpretation are reviewed *de novo*. *Hadix*, 228 F.3d at 670.

The district court entered the consent judgment based on a misinterpretation of the statute because, under Section 1621(d), a duly promulgated state regulation is a "State law."   The district court's interpretation of "State Law" under Section 1621(d) goes against the ordinary meaning of the term.

Section 1621(d) does not define the term "State law." When a statute does not define a term, the term receives its ordinary meaning.  *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021). To determine a term's ordinary meaning, "dictionary definitions can be useful." *Frenchko v. Monroe*, 160 F.4th 784, 797 (6th Cir. 2025). Black's Law Dictionary defines the term "State law" as "[a] body of law in a particular state consisting of the state's constitution, statutes, *regulations*, and common law." STATE LAW, Black's Law Dictionary (12th ed. 2024) (emphasis added).

---

[3] By failing to file a cross-appeal, Appellees have forfeited any argument that the consent decree is not illegal. *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) ("an appellate court may not alter a judgment to benefit a nonappealing party")

Further, the Sixth Circuit has confirmed that "[r]ead naturally, the unmodified phrase 'State law' embraces the use of *any* state law." *M.L. Johnson Family Properties, LLC v. Bernhardt,* 924 F.3d 842, 851 (6th Cir. 2019) (citing *Levin v. Miss. River Fuel Corp.*, 386 U.S. 162, 168 (1967) (emphasis in original)). "State law," standing alone, "includes the full range of a state's legislation, judicial precedents, and accepted legal principles." *Id.* (internal quotations omitted).

Yet, here, the district court concluded that the ordinary meaning of "State law" under Section 1621(d) is much narrower; it interprets "State law" as "State statute" or "State legislation." The district court cites to dicta in one unpublished case from the Southern District of Ohio, *Baltimore & Ohio R. Co. v. City of Piqua, Ohio*, but that case is not instructive here, nor binding on this Court. The *City of Piqua* court interpreted the term "State" rather than "law." *Baltimore & Ohio R. Co. v. City of Piqua, Ohio*, No. C-3-85-312, 1986 WL 8254 at *5 (S.D. Ohio June 30, 1986). And the Supreme Court has rejected *City of Piqua*'s holding that the term "State" necessarily excludes municipal or local regulation. *See e.g.*, *Ours Garage*, 536 U.S. at 429 ("Absent a clear statement to the contrary, Congress's reference to the "regulatory authority of a State" should be read to preserve, not preempt, the traditional prerogative of the States to delegate their authority to their constituent parts"). The Sixth Circuit has acknowledged that Supreme Court cases have abrogated the holding in *City of Piqua. See United Auto., Aerospace & Agric.*

*Implement Workers of Am. Loc. 3047 v. Hardin Cnty., Kentucky*, 842 F.3d 407, 416 (6th Cir. 2016) (recognizing abrogation of *CSX Transp., Inc. v. City of Plymouth*, 86 F.3d 626 (6th Cir. 1996)). Because its holding was abrogated, any persuasive value from *City of Piqua* is low. *See King v. Love*, 766 F.2d 962, 966 (6th Cir. 1985) (explaining that where a case's holding is abrogated, its dicta is also not instructive).

Following the ordinary meaning of "State law," Section 8(4)(a), as a duly enacted regulation within the state-granted authority of the issuing agency, is "State law" under Section 1621(d). Thus, there is no violation of federal law that requires the entry of the consent judgment. Because there is no violation of federal law and the consent judgment is illegal (violates Kentucky law), the district court abused its discretion in entering the consent judgment.

### A. PRWORA's Title and Purpose Cannot Contravene Its Plain Language

Because the ordinary meaning of "State law" under the federal statute is clear, the district court's inquiry into the title and overall purpose of the statute is unnecessary. That is because "[w]hen the statute's language is plain," as it is here, "the sole function of the courts is to enforce it according to its terms." *In re Reinhardt,* 177 F.4th 684, 707 (6th Cir. 2026) (internal quotations omitted). Even so, the other interpretive aids the district court relied on do not support the conclusion that "State law" under Section 1621(d) excludes duly-enacted regulations.

First, the title of 8 U.S.C. § 1621 provides little to no guidance on how to interpret the term "State law." Subsection 1621(d) provides an exception to the general rule of ineligibility set forth in the section as a whole, and the title provides no context as to the scope of this permissible exception. "[T]he title of a statute is of use only when it sheds light on some ambiguous word or phrase in the statute itself." *Carter v. United States*, 530 U.S. 255, 267 (2000) (citation modified). The title of 8 U.S.C. § 1621 merely states that general rule of ineligibility: "Aliens who are not qualified aliens or nonimmigrants ineligible for State and local public benefits." The title does not even tangentially touch on what appropriate state action is required to override the presumptive ineligibility described in the title.

And, even if it did more, a title "cannot limit the plain meaning of the text." *Whirlpool Fin. Corp. v. Comm'r of Internal Revenue,* 19 F.4th 944, 953 (6th Cir. 2021) (internal quotations omitted). That is because statutory titles "do not carry the force of law."[4] *United States v. Richardson*, 948 F.3d 733, 748 (6th Cir. 2020).

Second, "statutory exceptions are to be read fairly, not narrowly." *HollyFrontier*, 594 U.S. at 396. Indeed, "[a] congressional decision to enact both a general policy that furthers a particular goal and a specific exception that might tend against that goal does not invariably call for the narrowest possible construction of

---

[4] Unlike Kentucky regulations. *Hughes v. UPS Supply Chain Solutions, Inc.*, 677 S.W.3d 273, 280 (Ky. 2003).

the exception." *Ours Garage*, 536 U.S. at 440. Yet, the district court held the "exception was intended to be narrow" without any support for that intent other than the fact that subsection (d) provides an exception to the general rule of ineligibility. Order, R. 57, PageID # 471. That is a tautology, and as such provides no useful reasoning as to the scope or specifics of 1621(d). A very narrow construction[5] of the term "State law" does not "fairly" construe the exception because state regulations are, in common understanding, a type of "State law." STATE LAW, Black's Law Dictionary (12th ed. 2024).

Third, PRWORA's recitals have little value here because "[a] statutory statement of purpose provides no legal authority" and has "as much real-world effect as a congressional expression of apology." *Commonwealth v. Biden*, 57 F.4th 545, 551 (6th Cir. 2023) (citation modified). True, PRWORA was enacted in part because "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." Order, R. 57, PageID # 472 (quoting 8 U.S.C. § 1601(4), (6)). "But no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987). Enacted legislation is the result of compromise. "[D]eciding what competing values will or will not be

---

[5] The district court does not explain why its circular reasoning to embrace an extremely narrow construction should not go even further. Perhaps "State law" in section 1621(d) should be construed as not just legislation, but legislation enacted by a two-thirds majority of the legislature. In rejecting the plain meaning of "State law", the court provides no reasoning for the specific limit it drew.

29

sacrificed to the achievement of a particular objective is the very essence of legislative choice." *Id.* at 526. It is the responsibility of a court to apply what Congress wrote, not speculate as to how to further effectuate perceived legislative intent. *Luna Perez v. Sturgis Public Schools*, 598 U.S. 142, 150 (2023).

The district court erred in elevating PRWORA's putative goal over its clear and specific text. PRWORA's statement of policy cannot overcome the ordinary meaning of the term "State law." This recital says nothing as to the proper construction of an explicit congressional exception to the statute's purpose. And this statutory exception is just as important to Congress's work as the rest of the statute. *HollyFrontier*, 594 U.S. at 396.

### B. Unrelated Federal Statutes are also Not Instructive

The district court also erroneously turned to other federal statutes to interpret the meaning of "State law" under Section 1621(d). Order, R. 57, PageID # 472. Specifically, the district court pointed to the Employment Retirement Income Security Act ("ERISA"), which defines "State law" as "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." *Id.* (quoting 29 U.S.C. § 1144(c)(1)). In light of this definition, the district court reasoned, it "should not infer that Congress intended to include regulations as a proper means to satisfy § 1621(d) when elsewhere it specifically expanded the definition of State law to include regulations." *Id.*

First, the ERISA definition is not an expansion of the definition of "State law". As explained above, the plain, ordinary meaning of "law" encompasses all of the elements included in the ERISA definition, specifying many of the sources of "law" that govern and restrict legal conduct in a state. There is nothing unexpected or unusual in the ERISA definition, so it cannot mean that "State law" in PRWORA is somehow less than its ordinary broad-scope definition.

To reach its erroneous conclusion, the district court misapplied the *Russello* presumption—a canon of statutory construction. *See Russello v. United States*, 464 U.S. 16, 23 (1983). Under *Russello*, "where Congress includes particular language in one section of a statute but omits it in another section of the *same* Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* (emphasis added) (citation omitted). And the *Russello* presumption "grows weaker with each difference in the formulation of the provisions under inspection." *Ours Garage*, 536 U.S. at 435-36. Thus, ERISA, a wholly separate and lengthy federal enactment, is unhelpful here.

ERISA and PRWORA are different statutes with "different formulations addressing different circumstances." *See Reichert v. Kellogg Co.*, 170 F.4th 473, 486 (6th Cir. 2026) (holding *Russello* presumption did not apply to different sections of ERISA where provisions were dissimilar). In this case, ERISA and PRWORA have nothing to do with each other. And in any event, *Russello* is not "a dispositive

31

canon." *Grand Trunk Western R. Co. v. Department of Labor*, 875 F.3d 821, 825 (6th Cir. 2017). The mere fact that ERISA—a completely unrelated statute—defines "State law" inclusively does not mean "State law" in PRWORA should be defined exclusively to mean "State statute" or "State legislation" (particularly when neither is the word Congress used). *Cf. Henry Ford Health Sys. v. Dep't of Health & Hum. Servs.*, 654 F.3d 660, 666 (6th Cir. 2011) ("Specifying that something should be excluded in one context does not mean it must be included in a different context"). The district court "arbitrarily *constrict*[ed] [the statute] by adding limitations found nowhere in its terms." *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427, 439 (2019) (emphasis in original).

The district court concluded that if Congress had wanted Section 1621(d) to cover more than state statutes, it would have specified as much, like it did in ERISA. Order, R. 57, PageID # 472. But Congress could have just as "easily chosen to specify a limited type or subject matter of relevant state law" in Section 1621(d), and did not. *M.L. Johnson Family Properties, LLC v. Zinke*, 298 F.Supp.3d 1014, 1021-22 (E.D. Ky. 2018), *aff'd sub nom. M.L. Johnson Fam. Props., LLC v. Bernhardt*, 924 F.3d 842 (6th Cir. 2019). Thus, the term "State law" is not inherently limited to state statutes or state legislation. *See Management Recruiters Intern., Inc. v. Bloor*, 129 F.3d 851, 855 (6th Cir. 1997) (explaining that "law" is "a less specific word" than "statute"). Rather, the term "State statute" is limited and only refers to "[a] law

enacted by a legislative body" of a state. STATUTE, Black's Law Dictionary (12th ed. 2024). And Section 1621(d) doesn't use the term "State statute" or "State legislation," it says "State law." 8 U.S.C. § 1621(d). If only state statutes or state legislation could satisfy Section 1621(d)'s exception, those are the words Congress would have used. *See Pulsifer v. United States*, 601 U.S. 124, 149 (2024) (when interpreting statutes "different terms usually have different meanings").

### C. Congress Chose "State Law" Over Narrower Terms

"Above all else, [courts] must presume that Congress says in a statute what it means and means in a statute what it says." *J.B-K. by E.B. v. Secretary of Kentucky Cabinet for Health and Family Servs.*, 48 F.4th 721, 726 (6th Cir. 2022) (internal quotations omitted). If in drafting Section 1621(d) Congress had meant "State statute" or "State legislation" instead of "State law," it would have said so. *Bloor*, 129 F.3d at 855. ("If the parties had meant to arbitrate in Washington to the extent required by Washington *law* (as distinct from the Washington franchise investment *statute*), we presume they would have said so") (emphasis in original). Congress's decision to allow states to exercise their opt-out right in Section 1621(d) through an enactment of "State *law*" rather than "State *statute*" or "State *legislation*" means Kentucky properly exercised its opt-out right through CPE's promulgation of Section 8(4)(a).

33

Regardless of how the Court weighs these other authorities, "State law" should be construed to include duly promulgated State regulations to avoid absurd results. It is well established that when Congress allows a State to regulate, absent a clear statement to the contrary, municipalities and political subdivisions may also regulate. *See Ours Garage*, 536 U.S. at 429. It would be nonsensical if a grant of authority to a "State" to regulate, meaning a grant to the State and its political subdivisions, did not also extend that grant to the State's agencies. State agencies like CPE are arms of the state, akin to local governments. *Campbell v. Univ. of Louisville*, 862 F.Supp.2d 578, 582 (W.D. Ky. 2012). Thus, CPE *is* the State. *See Doe v. Ohio State University*, 219 F.Supp.3d 645, 654 (S.D. Ohio 2016). The Supreme Court explained in *Ours Garage* that statutes should be read to preserve the authority "of the States to delegate their authority to their constituent parts." *Ours Garage*, 536 U.S. at 429. CPE is one of Kentucky's constituent parts. Since CPE promulgated Section 8(4)(a) in its capacity as an instrumentality of the State, the regulation in Section 8(4)(a) also constitutes "State" law.

### III. The District Court's Narrow Construction of Section 1621(d) Violates the Tenth Amendment

The well-established doctrine of constitutional avoidance also leads to the conclusion that "State law" includes duly-enacted regulation under Section 1621(d). That is because restricting the term to statute or legislation would create a Tenth

Amendment violation through a congressional attempt to restructure Kentucky government – specifically, its rules on delegation of state lawmaking authority. How the states may structure their governance is a power the states retain under the Tenth Amendment.

The State of Kentucky chose to delegate its legislative powers over public postsecondary education to CPE. Ky. Rev. Stat. Ann. § 164.020(8)(a), (21). How a state forms its government is a core state authority. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). It cannot be invaded by federal interference. *See In re Vargas*, 10 N.Y.S.3d 579, 596 (2015). The federal government cannot change core attributes of state governance, even in areas where the federal government has broad authority, like immigration. *Id.* at 582 (interpreting Section 1621(d) as a requiring a "state legislative enactment" would be unconstitutional) The governance structure of a state is outside the realm of federal authority. *Ours Garage*, 536 U.S. at 430.

Courts "ought not pass on questions of constitutionality...unless such adjudication is unavoidable." *Griffith v. Franklin Cty., Kentucky*, 975 F.3d 554, 570 n. 5 (6th Cir. 2020). It is the district court's construction of Section 1621(d) that triggers this constitutional concern. If "State law" were (properly) construed to include all types of state law, the Tenth Amendment concern is alleviated. Thus, the courts' "duty" is to adopt that construction. *Jones v. United States*, 529 U.S. 848, 857 (2000).

### A. Kentucky's Choice to Delegate Legislative Power to an Administrative Agency Must Be Respected'

If "State law" as used in Section 1621(d) is truly a "State legislation" requirement, then Section 1621(d) tells states *how* they can exercise the powers the Tenth Amendment reserved to them. That requirement would unconstitutionally limit a state's power to regulate through legislative action alone, even if, as here, the state has chosen to order and arrange its government otherwise.

"Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign." *Gregory*, 501 at 460. One of the ways in which a state structures its government is by delegating power to the state's constituent parts. *Ours Garage*, 536 U.S. at 429. "How a State chooses to exercise the governmental powers entrusted to it… is in its 'absolute discretion.'" *Loc. 3047*, 842 F.3d at 415 (quoting *Ours Garage*, 536 U.S. at 437). And this discretion *is* absolute, even in an area where the federal government has broad authority, like immigration. "[T]he processes by which a state chooses to exercise, by one of its coequal branches of government, the authority granted by [8 U.S.C. § 1621(d)] is not a legitimate concern of the federal government." *In re Vargas*, 10 N.Y.S. 3d at 595 (2015).

Kentucky chose to delegate its legislative powers over public postsecondary education to CPE. Ky. Rev. Stat. Ann. § 164.020(8)(a), (21). It remains free to

rescind that delegation and reserve that power for itself, but time and again has chosen not to. *See Hughes*, 677 S.W.3d at 280. There is "no provision" in the Kentucky Constitution that explicitly declares legislative powers may not be delegated. *Marshall v. Commonwealth*, 719 S.W.3d 53, 60 (Ky. Ct. App. 2025), review denied (Sept. 10, 2025). Indeed, "Kentucky has recognized the lawful delegation of legislative powers for decades." *Id.* (quoting *Beshear v. Acree*, 615 S.W.3d 780, 787 (Ky. 2020)).

Under the Tenth Amendment, Kentucky "is entitled to order the processes of its own governance." *Alden v. Maine*, 527 U.S. 706, 752 (1999). That includes the ability to "allocate the lawmaking function to whichever branch of state government they may choose." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 462 n. 6 (1981). Thus, telling a state it may only act through legislative action unconstitutionally infringes on its sovereignty. *See Tennessee v. FCC*, 832 F.3d 597, 611 (6th Cir. 2016) ("Any attempt by the federal government to reorder the decision-making structure of a state and its municipalities trenches on the core sovereignty of that state").

"[F]ederal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power." *Nixon v. Missouri Municipal League*, 541 U.S. 125, 140 (2004). The district court's

interpretation of Section 1621(d) interferes with the Kentucky General Assembly's sovereign choice to delegate its power to an administrative agency. While *Nixon* addressed a state's delegation of power to political subdivisions, there is no reason that principle would not apply to a state's delegation to its constituent agencies. *See Rice v. Vill. of Johnstown, Ohio*, 30 F.4th 584, 589 (6th Cir. 2022) (quoting *United Beverage Co. of South Bend, Inc. v. Indiana Alcoholic Beverage Com'n.*, 760 F.2d 155, 158-59 (7th Cir. 1985) ("there is no independent federal constitutional doctrine of excessive delegation of state legislative power")).

Congress may not, for example, decide that a state must enact statutes through supermajority vote if the state has decided that legislation may be passed by simple majority. Nor could Congress require a state to bar veto overrides in a specific area of regulation if the state has a rule allowing such overrides by legislative supermajority vote. Congress also could not require a state to act through legislation in an area, such as bar admission of immigrants perhaps, that a state has assigned solely to its supreme court. Delegation of authority under state law and constitution is equally sacrosanct as a core attribute of state governance.

The Kentucky legislature chose to delegate its power to "[d]etermine tuition" at Kentucky public colleges and universities to CPE. Ky. Rev. Stat. Ann. § 164.020(8)(a). Since it decided to allow certain undocumented students to be eligible for regular tuition rates through an exercise of its delegated authority, federalism

dictates that sovereign choice be respected. Thus, avoiding a Tenth Amendment violation requires construing "State law" by its plain meaning, as including state law adopted through duly-enacted regulation, as occurred in Kentucky.

## CONCLUSION

Accordingly, the judgment of the district court should be reversed and remanded for further consideration of the United States' challenge to the legality of Section 8(4)(a).

Dated: July 10, 2026

Respectfully submitted,

*/s/ Olivia Alden*

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**

Thomas A. Saenz
643 S. Spring St., 11th Fl.
Los Angeles, CA 90014
Phone: (213) 629-2512
Email: tsaenz@maldef.org

Susana A. Sandoval Vargas
Olivia Alden
100 N. LaSalle St., Suite 1900
Chicago, IL 60602
Phone: (312) 427-0701
Email: ssandovalvargas@maldef.org
Email: oalden@maldef.org

*Attorneys for Appellant Kentucky Students for Affordable Tuition*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6, 762 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(5) and Sixth Circuit Rule 32(b)(1). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman font) using Microsoft Word (the same program used to calculate the word count).

/s/ *Olivia Alden*
Attorney for Appellant

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 10, 2026, I electronically filed the

forgoing with the Clerk of the Court for the United States Court of Appeals for the

Sixth Circuit by using the CM/ECF system, which shall send notification of such

filing to any CM/ECF participants.

/s/ *Olivia Alden*
Attorney for Appellant

# ADDENDUM I
# DESIGNATION OF RELEVANT DOCUMENTS

| Docket Entry No. | Description | Page ID # Range |
|---|---|---|
| 1 | United States' Complaint | 1-14 |
| 4 | United States' Amended Complaint | 30-43 |
| 24 | Joint Motion for Entry of Consent Judgment | 112-115 |
| 25 | Proposed Consent Judgment | 116 |
| 38 | Order Granting KSAT's Motion to Intervene | 286-304 |
| 43 | KSAT's Response in Opposition to Joint Motion for Entry of Consent Judgment | 356-374 |
| 48 | United States' Reply in Support of Joint Motion for Entry of Consent Judgment | 384-404 |
| 56 | Transcript of Hearing on Joint Motion for Entry of Consent Judgment | 416-453 |
| 57 | Memorandum Opinion & Order Granting Joint Motion for Entry of Consent Judgment and Adopting Proposed Consent Judgment | 454-475 |
| 58 | Notice of Appeal | 476-477 |

# ADDENDUM II

8 U.S.C. § 1621

**Aliens who are not qualified aliens or nonimmigrants ineligible for State and local public benefits**

**(a) In general**

Notwithstanding any other provision of law and except as provided in subsections (b) and (d), an alien who is not--

> **(1)** a qualified alien (as defined in section 1641 of this title),
>
> **(2)** a nonimmigrant under the Immigration and Nationality Act, or
>
> **(3)** an alien who is paroled into the United States under section 212(d)(5) of such Act for less than one year,

is not eligible for any State or local public benefit (as defined in subsection (c)).

**(b) Exceptions**

Subsection (a) shall not apply with respect to the following State or local public benefits:

> **(1)** Assistance for health care items and services that are necessary for the treatment of an emergency medical condition (as defined in section 1396b(v)(3) of Title 42) of the alien involved and are not related to an organ transplant procedure.
>
> **(2)** Short-term, non-cash, in-kind emergency disaster relief.
>
> **(3)** Public health assistance for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease.
>
> **(4)** Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General, in the Attorney General's sole and unreviewable discretion after consultation with appropriate Federal agencies and departments, which (A) deliver in-kind services at the community level,

including through public or private nonprofit agencies; (B) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (C) are necessary for the protection of life or safety.

### (c) "State or local public benefit" defined

(**1**) Except as provided in paragraphs (2) and (3), for purposes of this subchapter the term "State or local public benefit" means--

(**A**) any grant, contract, loan, professional license, or commercial license provided by an agency of a State or local government or by appropriated funds of a State or local government; and

(**B**) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government.

(**2**) Such term shall not apply--

(**A**) to any contract, professional license, or commercial license for a nonimmigrant whose visa for entry is related to such employment in the United States, or to a citizen of a freely associated state, if section 141 of the applicable compact of free association approved in Public Law 99-239 or 99-658 (or a successor provision) is in effect;

(**B**) with respect to benefits for an alien who as a work authorized nonimmigrant or as an alien lawfully admitted for permanent residence under the Immigration and Nationality Act qualified for such benefits and for whom the United States under reciprocal treaty agreements is required to pay benefits, as determined by the Secretary of State, after consultation with the Attorney General; or

(**C**) to the issuance of a professional license to, or the renewal of a professional license by, a foreign national not physically present in the United States.

(**3**) Such term does not include any Federal public benefit under section 1611(c) of this title.

**(d) State authority to provide for eligibility of illegal aliens for State and local public benefits**

A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility.

# ADDENDUM III

13 Ky. Admin. Regs. 2:045

RELATES TO: KRS 13B, 164.020, 164.030, 164A.330(6), 38 U.S.C. 3301 - 3325

STATUTORY AUTHORITY: KRS 164.020(8)

NECESSITY, FUNCTION, AND CONFORMITY: KRS 164.020(8) requires the Council on Postsecondary Education to determine tuition and approve the minimum qualifications for admission to a state postsecondary education institution and authorizes the Council to set different tuition amounts for residents of Kentucky and for nonresidents. This administrative regulation establishes the procedure and guidelines for determining the residency status of a student who is seeking admission to, or who is enrolled at, a state-supported postsecondary education institution.

Section 1. Definitions.

(1) "Academic term" means a division of the school year during which a course of studies is offered, and includes a semester, quarter, or single consolidated summer term as defined by the institution.

(2) "Continuous enrollment" means enrollment in a state-supported postsecondary education institution at the same degree level for consecutive terms, excluding summer term, since the beginning of the period for which continuous enrollment is claimed unless a sequence of continuous enrollment is broken due to extenuating circumstances beyond the student's control, such as serious personal illness or injury, or illness or death of a parent.

(3) "Degree level" means enrollment in a course or program that could result in the award of a:

    (a) Certificate, diploma, or other program award at an institution;

    (b) Baccalaureate degree or lower, including enrollment in a course by a nondegree-seeking post baccalaureate student;

    (c) Graduate degree or graduate certification other than a first-professional degree in law, medicine, dentistry, or "Pharm. D"; or

    (d) Professional degree in law, medicine, dentistry, or "Pharm. D".

46

(4) "Dependent person" means a person who cannot demonstrate financial independence from parents or persons other than a spouse and who does not meet the criteria for independence established in Section 5 of this administrative regulation.

(5) "Determination of residency status" means the decision of a postsecondary education institution that results in the classification of a person as a Kentucky resident or as a nonresident for admission and tuition assessment purposes.

(6) "Domicile" means a person's true, fixed, and permanent home and is the place where the person intends to remain indefinitely, and to which the person expects to return if absent without intending to establish a new domicile elsewhere.

(7) "Full-time employment" means continuous employment for at least forty-eight (48) weeks at an average of at least thirty (30) hours per week.

(8) "Independent person" means a person who demonstrates financial independence from parents or persons other than a spouse and who meets the criteria for independence established in Section 5 of this administrative regulation.

(9) "Institution" means an entity defined by KRS 164.001(12) if the type of institution is not expressly stated and includes the Kentucky Virtual University, the Council on Postsecondary Education, and the Kentucky Higher Education Assistance Authority.

(10) "Kentucky resident" means a person determined by an institution for tuition purposes to be domiciled in, and a resident of, Kentucky as determined by this administrative regulation.

(11) "Nonresident" means a person who:

    (a) Is domiciled outside Kentucky;

    (b) Currently maintains legal residence outside Kentucky; or

    (c) Is not a Kentucky resident as determined by this administrative regulation.

(12) "Parent" means one (1) of the following:

    (a) A person's father or mother; or

    (b) A court-appointed legal guardian if:

1. The guardianship is recognized by an appropriate court within the United States;

2. There was a relinquishment of the rights of the parents; and

3. The guardianship was not established primarily to confer Kentucky residency on the person.

(13) "Preponderance of the evidence" means the greater weight of evidence or evidence that is more credible and convincing to the mind.

(14) "Residence" means the place of abode of a person and the place where the person is physically present most of the time for a noneducational purpose in accordance with Section 3 of this administrative regulation.

(15) "Student financial aid" means all forms of payments to a student if one (1) condition of receiving the payment is the enrollment of the student at an institution, and includes student employment by the institution or a graduate assistantship.

(16) "Sustenance" means:

(a) Living expenses, such as room, board, maintenance, and transportation; and

(b) Educational expenses, such as tuition, fees, books, and supplies.

Section 2. Scope.

(1) State-supported postsecondary education institutions were established and are maintained by the Commonwealth of Kentucky primarily for the benefit of qualified residents of Kentucky. The substantial commitment of public resources to postsecondary education is predicated on the proposition that the state benefits significantly from the existence of an educated citizenry. As a matter of policy, access to postsecondary education shall be provided so far as feasible at reasonable cost to a qualified individual who is domiciled in Kentucky and who is a resident of Kentucky.

(2) In accordance with the duties established in KRS 164.020, the Council on Postsecondary Education may require a student who is neither domiciled in, nor a resident of, Kentucky to meet higher admission standards and to pay a higher level of tuition than resident students.

(3) Unless otherwise indicated, this administrative regulation shall apply to all student residency determinations, regardless of circumstances, including residency determinations made by:

(a) The state-supported institutions for prospective and currently-enrolled students;

(b) The Southern Regional Education Board for contract spaces;

(c) Reciprocity agreements, if appropriate;

(d) The Kentucky Virtual University;

(e) Academic common market programs;

(f) The Kentucky Educational Excellence Scholarship Program; and

(g) Other state student financial aid programs, as appropriate.

Section 2. Scope.

(1) State-supported postsecondary education institutions were established and are maintained by the Commonwealth of Kentucky primarily for the benefit of qualified residents of Kentucky. The substantial commitment of public resources to postsecondary education is predicated on the proposition that the state benefits significantly from the existence of an educated citizenry. As a matter of policy, access to postsecondary education shall be provided so far as feasible at reasonable cost to a qualified individual who is domiciled in Kentucky and who is a resident of Kentucky.

(2) In accordance with the duties established in KRS 164.020, the Council on Postsecondary Education may require a student who is neither domiciled in, nor a resident of, Kentucky to meet higher admission standards and to pay a higher level of tuition than resident students.

(3) Unless otherwise indicated, this administrative regulation shall apply to all student residency determinations, regardless of circumstances, including residency determinations made by:

(a) The state-supported institutions for prospective and currently-enrolled students;

(b) The Southern Regional Education Board for contract spaces;

(c) Reciprocity agreements, if appropriate;

(d) The Kentucky Virtual University;

(e) Academic common market programs;

(f) The Kentucky Educational Excellence Scholarship Program; and

(g) Other state student financial aid programs, as appropriate.

(2) An initial determination of residency status shall be based upon:

(a) The facts in existence when the credentials established by an institution for admission for a specific academic term have been received and during the period of review by the institution;

(b) Information derived from admissions materials;

(c) If applicable, other materials required by an institution and consistent with this administrative regulation; and

(d) Other information available to the institution from any source.

(3) An individual seeking a determination of Kentucky residency status shall demonstrate that status by a preponderance of the evidence.

(4) A determination of residency status shall be based upon verifiable circumstances or actions.

(5) Evidence and information cited as the basis for Kentucky domicile and residency shall accompany the application for a determination of residency status.

(6) A student classified as a nonresident shall retain that status until the student is officially reclassified by an institution.

(7) A student may apply for a review of a determination of residency status once for each academic term.

(8) If an institution has information that a student's residency status may be incorrect, the institution shall review and determine the student's correct residency status.

(9) If the Council on Postsecondary Education has information that an institution's determination of residency status for a student may be incorrect, it may require the institution to review the circumstances and report the results of that review.

(10) An institution shall impose a penalty or sanction against a student who gives incorrect or misleading information to an institutional official, including payment of nonresident tuition for each academic term for which resident tuition was assessed based on an improper determination of residency status. The penalty or sanction may also include:

(a) Student discipline by the institution through a policy written and disseminated to students; or

(b) Criminal prosecution.

Section 4. Presumptions Regarding Residency Status.

(1) In making a determination of residency status, it shall be presumed that a person is a nonresident if:

(a) A person is, or seeks to be, an undergraduate student and admissions records show the student to be a graduate of an out-of-state high school within five (5) years prior to a request for a determination of residency status;

(b) A person's admissions records indicate the student's residence to be outside of Kentucky when the student applied for admission;

(c) A person moves to Kentucky primarily for the purpose of enrollment in an institution;

(d) A person moves to Kentucky and within twelve (12) months enrolls at an institution more than half time;

(e) A person has a continuous absence of one (1) year from Kentucky; or

(f) A person attended an out-of-state higher education institution during the past academic year and paid in-state tuition at that institution.

(2) A presumption arising from subsection (1) of this section shall only be overcome by preponderance of evidence sufficient to demonstrate that a person is domiciled in and is a resident of Kentucky.

(2) A presumption arising from subsection (1) of this section shall only be overcome by preponderance of evidence sufficient to demonstrate that a person is domiciled in and is a resident of Kentucky.

Section 5. Determination of Whether a Student is Dependent or Independent.

(1) In a determination of residency status, an institution shall first determine whether a student is dependent or independent. This provision shall be predicated on the assumption that a dependent person lacks the financial ability to live independently of the person upon whom the student is dependent, and therefore, lacks the ability to form the requisite intent to establish domicile. A determination that a student is independent shall be one (1) step in the overall determination of whether a student is or is not a resident of Kentucky.

(2) In determining the dependent or independent status of a person, the following information shall be considered, as well as other relevant information available when the determination is made:

(a) 1. Whether the person has been claimed as a dependent on the federal or state tax returns of a parent or other person for the year preceding the date of application for a determination of residency status; or

2. Whether the person is no longer claimed by a parent or other person as a dependent or as an exemption for federal and state tax purposes; and

(b) Whether the person has financial earnings and resources independent of a person other than an independent spouse necessary to provide for the person's own sustenance.

(3) An individual who enrolls at an institution immediately following graduation from high school and remains enrolled shall be presumed to be a dependent person unless the contrary is evident from the information submitted.

(4) Domicile may be inferred from the student's permanent address, parent's mailing address, or location of high school of graduation.

(5) Marriage to an independent person domiciled in and who is a resident of Kentucky shall be a factor considered by an institution in determining whether a student is dependent or independent.

(6) Financial assistance from, or a loan made by, a parent or family member other than an independent spouse, if used for sustenance of the student:

(a) Shall not be considered in establishing a student as independent; and

(b) Shall be a factor in establishing that a student is dependent.

Section 6. Effect of a Determination of Dependent Status on a Determination of Residency Status.

(1) The effect of a determination that a person is dependent shall be:

(a) The domicile and residency of a dependent person shall be the same as either parent. The domicile and residency of the parent shall be determined in the same manner as the domicile and residency of an independent person; and

(b) The domicile and residency of a dependent person whose parents are divorced, separated, or otherwise living apart shall be Kentucky if either parent is domiciled in and is a resident of Kentucky, regardless of which parent has legal custody or is entitled to claim that person as a dependent pursuant to federal or Kentucky income tax provisions.

(2) If the parent or parents of a dependent person are Kentucky residents and are domiciled in Kentucky, but subsequently move from the state:

(a) The dependent person shall be considered a resident of Kentucky while in continuous enrollment at the degree level in which currently enrolled; and

(b) The dependent person's residency status shall be reassessed if continuous enrollment is broken or the current degree level is completed.

Section 7. Member or Former Member of Armed Forces of the United States, Spouse and Dependents; Effect on a Determination of Residency Status.

(1) A member, spouse, or dependent of a member whose domicile and residency was Kentucky when inducted into the Armed Forces of the United States, and who maintains Kentucky as home of record and permanent address, shall be entitled to Kentucky residency status:

(a) During the member's time of active service; or

(b) If the member returns to this state within six (6) months of the date of the member's discharge from active duty.

(2) (a) A member of the armed services on active duty for more than thirty (30) days and who has a permanent duty station in Kentucky shall be classified as a Kentucky resident and shall be entitled to in-state tuition, as shall the spouse or a dependent child of the member.

(b) A member, spouse, or dependent of a member shall not lose Kentucky residency status if the member is transferred on military orders while the member, spouse, or dependent requesting the status is in continuous enrollment at the degree level in which currently enrolled.

(3) Membership in the National Guard or civilian employment at a military base alone shall not qualify a person for Kentucky residency status under the provisions of subsections (1) and (2) of this section. If a member of the Kentucky National Guard is on active duty status for a period of not less than thirty (30) days, the member shall be considered a Kentucky resident, as shall the spouse or a dependent child of the member.

(4) A person eligible for benefits under the federal Post-9/11 Veterans Educational Assistance Act of 2008, 38 U.S.C. 3301-3325, or any other educational benefits provided under Title 38 of the United States Code shall be entitled to Kentucky resident status for purposes of tuition charged at state-supported institutions.

(5) A person's residency status established pursuant to this section shall be reassessed if the qualifying condition is terminated.

Section 8. Status of Nonresident Aliens; Visas and Immigration.

(1) (a) A person holding a permanent residency visa or classified as a political refugee shall establish domicile and residency in the same manner as another person.

(b) Time spent in Kentucky and progress made in fulfilling the conditions of domicile and residency prior to obtaining permanent residency status shall be considered in establishing Kentucky domicile and residency.

(2) A person holding a nonimmigrant visa with designation A, E, G, H-1, H-4 if accompanying a person with an H-1 visa, I, K, L, N, R, shall establish domicile and residency the same as another person.

(3) (a) An independent person holding a nonimmigrant visa with designation B, C, D, F, H-2, H-3, H-4 if accompanying a person with an H-2 or H-3 visa, J, M, O, P, Q, S, TD, or TN shall not be classified as a Kentucky resident because that person does not have the capacity to remain in Kentucky indefinitely and therefore cannot form the requisite intent necessary to establish domicile as defined in Section 1(6) of this administrative regulation.

(b) A dependent person holding a visa as described in paragraph (a) of this subsection, but who is a dependent of a parent holding a visa as described in subsection (2) of this section, shall be considered as holding the visa of the parent.

(c) A dependent person holding a visa described in subsection (2) of this section or paragraph (a) of this subsection, if a parent is a citizen of the United States and is a resident of and domiciled in Kentucky, shall be a resident of Kentucky for the purposes of this administrative regulation.

(4) A person shall be a Kentucky resident for the purpose of this administrative regulation if the person graduated from a Kentucky high school and:

(a) Is an undocumented alien;

(b) Holds a visa listed in subsections (2) or (3)(a) of this section; or

(c) Is a dependent of a person who holds a visa listed in subsections (2) or (3)(a) of this section.

(5) (a) Except as provided in paragraph (b) of this subsection, a person who has petitioned the federal government to reclassify visa status shall continue to be ineligible until the petition has been granted by the federal government.

(b) A person who has petitioned the federal government to reclassify his or her visa status based on marriage to a Kentucky resident and who can demonstrate that the petition has been filed and acknowledged by the federal government, may establish Kentucky domicile and residency at that time.

Section 9. Beneficiaries of a Kentucky Educational Savings Plan Trust. A beneficiary of a Kentucky Educational Savings Plan Trust shall be granted residency status if the beneficiary meets the requirements of KRS 164A.330(6).

Section 10. Criteria Used in a Determination of Residency Status.

(1) (a) A determination of Kentucky domicile and residency shall be based upon verifiable circumstances or actions.

(b) A single fact shall not be paramount, and each situation shall be evaluated to identify those facts essential to the determination of domicile and residency.

(c) A person shall not be determined to be a Kentucky resident by the performance of an act that is incidental to fulfilling an educational purpose or by an act performed as a matter of convenience.

(d) Mere physical presence in Kentucky, including living with a relative or friend, shall not be sufficient evidence of domicile and residency.

(e) A student or prospective student shall respond to all requests for information regarding domicile or residency requested by an institution.

(2) The following facts, although not conclusive, shall have probative value in their entirety and shall be individually weighted, appropriate to the facts and circumstances in each determination of residency:

(a) Acceptance of an offer of full-time employment or transfer to an employer in Kentucky or contiguous area while maintaining residence and domicile in Kentucky;

(b) Continuous physical presence in Kentucky while in a nonstudent status for the twelve (12) months immediately preceding the start of the academic term for which a classification of Kentucky residency is sought;

(c) 1. Filing a Kentucky resident income tax return for the calendar year preceding the date of application for a change in residency status; or

2. Payment of Kentucky withholding taxes while employed during the calendar year for which a change in classification is sought;

(d) Full-time employment of at least one (1) year while living in Kentucky;

(e) Attendance as a full-time, nonresident student at an out-of-state institution based on a determination by that school that the person is a resident of Kentucky;

(f) Abandonment of a former domicile or residence and establishing domicile and residency in Kentucky with application to or attendance at an institution following and incidental to the change in domicile and residency;

(g) Obtaining licensing or certification for a professional and occupational purpose in Kentucky;

(h) Payment of real property taxes in Kentucky;

(i) Ownership of real property in Kentucky, if the property was used by the student as a residence preceding the date of application for a determination of residency status;

(j) Marriage of an independent student to a person who was domiciled in and a resident of Kentucky prior to the marriage; and

(k) The extent to which a student is dependent on student financial aid in order to provide basic sustenance.

(3) Except as provided in subsection (4) of this section, the following facts, because of the ease and convenience in completing them, shall have limited probative value in a determination that a person is domiciled in and is a resident of Kentucky:

(a) Kentucky automobile registration;

(b) Kentucky driver's license;

(c) Registration as a Kentucky voter;

(d) Long-term lease of at least twelve (12) consecutive months of noncollegiate housing; and

(e) Continued presence in Kentucky during academic breaks.

(4) The absence of a fact contained in subsection (3) of this section shall have significant probative value in determining that a student is not domiciled in or is not a resident of Kentucky.

Section 11. Effect of a Change in Circumstances on Residency Status.

(1) If a person becomes independent or if the residency status of a parent or parents of a dependent person changes, an institution shall reassess residency either upon a request by the student or a review initiated by the institution.

(2) Upon transfer to a Kentucky institution, a student's residency status shall be assessed by the receiving institution.

(3) A reconsideration of a determination of residency status for a dependent person shall be subject to the provisions for continuous enrollment, if applicable.

Section 12. Student Responsibilities.

(1) A student shall report under the proper residency classification, which includes the following actions:

(a) Raising a question concerning residency classification;

(b) Making application for change of residency classification with the designated office or person at the institution; and

(c) Notifying the designated office or person at the institution immediately upon a change in residency.

(2) If a student fails to notify an institutional official of a change in residency, an institutional official may investigate and evaluate the student's residency status.

(3) (a) If a student fails to provide, by the date specified by the institution, information required by an institution in a determination of residency status, the student shall be notified by the institution that the review has been canceled and that a determination has been made.

(b) Notification shall be made by registered mail, return receipt requested.

(c) Notification shall be made within ten (10) calendar days after the deadline for receipt of materials has passed.

(4) (a) The formal hearing conducted by an institution and the final recommended order shall be a final administrative action with no appeal to the Council on Postsecondary Education.

(b) A formal administrative hearing conducted by the Council on Postsecondary Education for residency determinations related to eligibility for the Academic Common Market and Regional Contract Programs shall be conducted pursuant to the provisions of KRS Chapter 13B and 13 KAR 2:070. The recommended order issued by the President of the Council shall be a final administrative action.

(5) A student shall not be entitled to appeal a determination of residency status if the determination made by an institution is because a student has failed to meet published deadlines for the submission of information as set forth in subsection (3) of this section. A student may request a review of a determination of residency status in a subsequent academic term.

Section 13. Institutional Responsibilities. Each institution shall:

(1) Provide for an administrative appeals process that includes a residency appeals officer to consider student appeals of an initial residency determination and which shall include a provision of fourteen (14) days for the student to appeal the residency appeals officer's determination;

(2) Establish a residency review committee to consider appeals of residency determinations by the residency appeals officer. The residency review committee shall make a determination of student residency status and notify the student in writing within forty-five (45) days after receipt of the student appeal;

(3) Establish a formal hearing process as described in Section 14 of this administrative regulation; and

(4) Establish written policies and procedures for administering the responsibilities established in subsections (1), (2), and (3) of this section and that are:

    (a) Approved by the institution's governing board;

    (b) Made available to all students; and

    (c) Filed with the council.

Section 14. Formal Institutional Hearing.

(1) A student who appeals a determination of residency by a residency review committee shall be granted a formal hearing by an institution if the request is made by a student in writing within fourteen (14) calendar days after notification of a determination by a residency review committee.

(2) If a request for a formal hearing is received, an institution shall appoint a hearing officer to conduct a formal hearing. The hearing officer shall:

    (a) Be a person not involved in determinations of residency at an institution except for formal hearings; and

    (b) Not be an employee in the same organizational unit as the residency appeals officer.

(3) An institution shall have written procedures for the conduct of a formal hearing that have been adopted by the board of trustees or regents, as appropriate, and that provide for:

    (a) A hearing officer to make a recommendation on a residency appeal;

(b) Guarantees of due process to a student that include:

1. The right of a student to be represented by legal counsel; and

2. The right of a student to present information and to present testimony and information in support of a claim of Kentucky residency; and

(c) A recommendation to be issued by the hearing officer.

(4) An institution's formal hearing procedures shall be filed with the Council on Postsecondary Education and shall be available to a student requesting a formal hearing.

Section 15. Cost of Formal Hearings.

(1) An institution shall pay the cost for all residency determinations including the cost of a formal hearing.

(2) A student shall pay for the cost of all legal representation in support of the student's claim of residency.