**No. 26-5303**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

KENTUCKY COUNCIL ON POSTSECONDARY EDUCATION, AARON THOMPSON, PRESIDENT OF THE KENTUCKY COUNCIL ON POSTSECONDARY EDUCATION, IN HIS OFFICIAL CAPACITY,
*Defendants-Appellees*,

*and*

KENTUCKY STUDENTS FOR AFFORDABLE TUITION,
*Intervenor-Defendant-Appellant*.

On Appeal from the United States District Court
for the Eastern District of Kentucky

# BRIEF FOR UNITED STATES

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
ANDREW M. BERNIE
*Attorneys, Appellate Staff*
*Civil Division, Room 7539*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3511*

# TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

STATEMENT OF JURISDICTION ..... 3

STATEMENT OF THE ISSUE ..... 3

STATEMENT OF THE CASE ..... 4

A. Statutory Background ..... 4

B. Factual Background ..... 7

SUMMARY OF ARGUMENT ..... 8

STANDARD OF REVIEW ..... 11

ARGUMENT ..... 11

I. The district court had jurisdiction over this action and properly addressed the merits of the claim under § 1621. ..... 11

II. Section 1621(a) preempts the challenged regulation. ..... 15

III. Section 1623(a) also preempts Kentucky's regulation making unlawful aliens eligible for in-state tuition. ..... 23

A. In-state tuition is a post-secondary education benefit. ..... 24

B. The regulation provides benefits "on the basis of residence" within Kentucky. ..... 26

C. The regulation does not provide the same benefits to citizens and nationals of the United States who are not residents of Kentucky. ..... 32

D. KSAT's constitutional and constitutional avoidance arguments lack merit. ........ 35

CONCLUSION ........ 37

CERTIFICATE OF COMPLIANCE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Abramski v. United States*,
573 U.S. 169 (2014) ... 30

*Anderson v. Crouch*,
169 F.4th 474 (4th Cir. 2026) ... 28

*Bryan v. Government of the Virgin Islands*,
916 F.3d 242 (3d Cir. 2019) ... 28

*Exxon Mobil Corp. v. Corporación Cimex, S.A.*,
146 S. Ct. 1909 (2026) ... 30

*GTE Mobilnet of Ohio v. Johnson*,
111 F.3d 469 (6th Cir. 1997) ... 11

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*,
452 U.S. 264 (1981) ... 21, 37

*INS v. Chadha*,
462 U.S. 919 (1983) ... 8, 12, 14

*M.L. Johnson Fam. Props., LLC v. Bernhardt*,
924 F.3d 842 (6th Cir. 2019) ... 18

*Murphy v. National Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) ... 11, 35, 36

*Nixon v. Missouri Municipal League*,
541 U.S. 125 (2004) ... 22

*Pacific Shores Props., LLC v. City of Newport Beach*,
730 F.3d 1142 (9th Cir. 2013) ... 28

*Personnel Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) ... 28-29

*Plyler v. Doe*,
457 U.S. 202 (1982) ... 16

*Printz v. United States*,
521 U.S. 898 (1997) .......... 11, 21

*Quarles v. United States*,
587 U.S. 645 (2019) .......... 30

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*,
600 U.S. 181 (2023) .......... 29

*United States v. Blewett*,
746 F.3d 647 (6th Cir. 2013) .......... 23

*United States v. Lumbard*,
706 F.3d 716 (6th Cir. 2013) .......... 11

*United States v. Richardson*,
960 F.3d 761 (6th Cir. 2020) .......... 23

*United States v. Smart*,
406 F. App'x 14 (6th Cir. 2010) .......... 14

*United States v. Texas*,
181 F.4th 548 (5th Cir. 2026) .......... 5, 34

*United States v. Walz*,
825 F. Supp. 3d 897 (D. Minn. 2026) .......... 27

*United States v. Windsor*,
570 U.S. 744 (2013) .......... 8, 12, 13

*Young Conservatives of Tex. Found. v. Smatresk*,
73 F.4th 304 (5th Cir. 2023) .......... 5

**Statutes:**

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA),
Pub. L. No. 104-208, div. C, tit. III, subtitle A, 110 Stat. 3009–546:
§ 306, 110 Stat. at 3009–607 .......... 5
§ 308, 110 Stat. at 3009–614 .......... 5

Personal Responsibility and Work Opportunity Reconciliation Act of 1996,
Pub. L. No. 104-193, 110 Stat. 2105 .......... 4

Post-9/11 Veterans Educational Assistance Act of 2008,
38 U.S.C. §§ 3301-3325 ....................33

8 U.S.C. § 1101(a)(33) ....................29, 31

8 U.S.C. § 1601(2)(B) ....................16

8 U.S.C. § 1601(5)-(6) ....................16

8 U.S.C. § 1611 ....................15

8 U.S.C. §§ 1611-1612 ....................30

8 U.S.C. § 1621 ....................3, 24, 30

8 U.S.C. § 1621(a) ....................1, 2, 4, 5, 18

8 U.S.C. § 1621(b) ....................19

8 U.S.C. § 1621(c) ....................18

8 U.S.C. § 1621(c)(1)(B) ....................4, 15

8 U.S.C. § 1621(d) .................... 1, 2, 5, 9, 14 17, 18, 20

8 U.S.C. § 1623 ....................3, 5

8 U.S.C. § 1623(a) .................... 1, 2, 10, 14, 24, 32, 33

8 U.S.C. § 1641(a) ....................30

8 U.S.C. § 1641(b) ....................4

28 U.S.C. § 1291 ....................3

28 U.S.C. § 3702 ....................35

28 U.S.C. § 1331 ....................3, 12

28 U.S.C. § 1345 ....................3, 12

Ky. Rev. Stat. Ann. § 164.020(8)(a) ....................6, 20, 26

**Regulations:**

13 Ky. Admin. Regs. 2:045, § 1(5) ........ 1, 6, 26

13 Ky. Admin. Regs. 2:045, § 1(10) ........ 1, 6, 26, 32

13 Ky. Admin. Regs. 2:045, § 1(11) ........ 1, 32

13 Ky. Admin. Regs. 2:045, § 7(4) ........ 33

13 Ky. Admin. Regs. 2:045, § 8(4)(a) ........ 1, 6, 26

13 Ky. Admin. Regs. 2:045, § 9 ........ 33

29 Ky. Admin. Reg. 749-751 ........ 6

**Legislative Materials:**

H.R. Rep. No. 104-725 (1996) (Conf. Rep.) ........ 2, 9, 19

H.R. Rep. No. 104-828 (1996) (Conf. Rep.) ........ 25

**Other Authorities:**

*Benefit*, Black's Law Dictionary (12th ed. 2024) ........ 24

*Benefit*, Merriam-Webster's Collegiate Dictionary (10th ed. 1997) ........ 25

*Benefit*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/benefit ........ 24-25

*Enactment*, Black's Law Dictionary (12th ed. 2024) ........ 17

*State Law*, Black's Law Dictionary (12th ed. 2024) ........ 17, 18

Univ. of Ky., *2026-2027 Estimated Cost of Attendance*, https://perma.cc/H2EJ-UB6Y ........ 6, 26

## STATEMENT REGARDING ORAL ARGUMENT

The United States defers to the Court on whether oral argument is appropriate in this case, but the United States intends to participate if oral argument is scheduled.

# INTRODUCTION

Federal law provides that unlawfully present aliens are ineligible for a broad swath of state and local public benefits, including postsecondary education benefits. 8 U.S.C. § 1621(a), (c). A separate statute specifically preempts state laws purporting to provide in-state college tuition to unlawfully present aliens: "an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State . . . for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such a resident." *Id.* § 1623(a). The former restriction, but not the latter and more specific one, may be overridden by "the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility." *Id.* § 1621(d).

Kentucky—following a "Determination of residency status," 13 Ky. Admin. Regs. 2:045, § 1(5)—allows those it determines are "Kentucky resident[s]," *id.* § 1(10) (quotation marks omitted), to attend college at significantly lower tuition rates than "Nonresident[s]," *id.* § 1(11) (quotation marks omitted). Kentucky has no statute purporting to provide in-state tuition benefits to unlawful aliens. But despite both federal statutes, the regulation provides that "an undocumented alien" "shall be a Kentucky resident for the purpose of this administrative regulation" if the alien "graduated from a Kentucky high school," *id.* § 8(4)(a).

The United States accordingly filed this lawsuit, seeking invalidation of this regulation on the grounds that it is preempted by both 8 U.S.C. § 1621(a), (d), and 8 U.S.C. § 1623(a). Defendants ultimately agreed with the United States that the regulation was preempted by federal law, and the parties jointly moved for a consent judgment declaring the regulation invalid and enjoining its enforcement. After the parties filed this motion, the Kentucky Students for Affordable Tuition (KSAT) moved to intervene to defend the regulation, and the district court granted intervention. The court subsequently granted the original parties' motion and entered the proposed consent judgment, holding that the challenged regulation was preempted by federal law.

The district court's decision and judgment were correct. Sections 1621(a), (d), and 1623(a) each independently preempt the challenged regulation. Congress provided that states could override the eligibility determination in § 1621(a) only through a specified procedure: "enactment of a State law after August 22, 1996." As a matter of both plain meaning and ordinary parlance, the phrase "enactment of a State law" means a statute passed by the state legislature. That plain-text reading is confirmed by directly-on-point legislative history, which states that Congress intended "[o]nly the affirmative enactment of a law by a State legislature and signed by the Governor" to be sufficient. H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.). And although the court did not address § 1623(a), that provision

independently preempts the challenged regulation. The challenged regulation purports to provide a postsecondary education benefit (reduced college tuition) to unlawfully present aliens on the basis of residence, while not providing that same benefit to nonresident U.S. citizens and nationals—exactly the scheme § 1623(a) preempts. KSAT lodges a number of constitutional objections to § 1621, but those objections are insubstantial, as are KSAT's similar constitutional objections in the district court to § 1623.

This Court should affirm.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, because this is a suit brought by the United States that arises under federal law. *See also infra* pp. 11-14. The district court granted appellees' joint motion for entry of the consent judgment and adopted the proposed consent decree on March 31, 2026. KSAT timely filed a notice of appeal on April 3, 2026. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether federal law—8 U.S.C. § 1623, 8 U.S.C. § 1621, or both— preempts Kentucky regulations purporting to make aliens not lawfully present in the United States eligible for in-state tuition rates.

## STATEMENT OF THE CASE

### A. Statutory Background

**1.** In 1996, Congress passed and President Clinton signed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, which deems certain categories of aliens ineligible to obtain various public benefits. With certain listed exceptions not relevant here, the Act deems ineligible for "any State or local public benefit" any alien who is not a "qualified alien" within the meaning of the Act. 8 U.S.C. § 1621(a). Unsurprisingly, unlawfully present aliens are not "qualified aliens." *See id.* § 1641(b). The term "public benefit" includes "any retirement, welfare, health, disability, public or assisted housing, *postsecondary education*, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government." *Id.* § 1621(c)(1)(B) (emphasis added).

One statutory exception to § 1621's bar on eligibility is relevant here. Congress provided that "[a] State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a)"—that is, the restriction discussed above—"only through the enactment of a State law after

August 22, 1996, which affirmatively provides for such eligibility." 8 U.S.C. § 1621(d); *see also id.* § 1621(a) (providing for a bar on eligibility "except as provided" in subsections (b) and (d)).

**2.** In 1996, Congress also passed, and President Clinton signed, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). *See* IIRIRA, Pub. L. No. 104-208, div. C, tit. III, subtitle A, §§ 306, 308, 110 Stat. 3009–546, 3009–607-12, 3009–614-25. As relevant here, IIRIRA included a clear "[l]imitation on eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education benefits." 8 U.S.C. § 1623. Section 1623(a) provides as follows:

> Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

*Id.* § 1623(a); *see also Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 312 (5th Cir. 2023) (observing that statute imposes a "condition precedent" for unlawful aliens' eligibility for residence-based benefits (quotation marks omitted)); *United States v. Texas*, 181 F.4th 548, 555 (5th Cir. 2026) (holding that § 1623(a) preempted Texas scheme making unlawful aliens who satisfy residence requirements eligible for in-state tuition where nonresident citizens were not eligible).

**3.** Like most states, Kentucky charges one tuition rate for those it deems Kentucky residents and charges non-residents considerably more. *See, e.g.*, Univ. of Ky., *2026-2027 Estimated Cost of Attendance*, https://perma.cc/H2EJ-UB6Y (undergraduate tuition and fees of $14,178 for in-state students and $35,846 for out-of-state students). A Kentucky statute directs the Kentucky Council for Post-Secondary Education (Kentucky Council) to "classify a student as having Kentucky residency if the student met the residency requirements at the beginning of his or her last year in high school and enters a Kentucky postsecondary education institution within two . . . years of high school graduation." Ky. Rev. Stat. Ann. § 164.020(8)(a).

By regulation, the Kentucky Council purports to extend eligibility for in-state tuition to unlawfully present aliens it considers state residents. Kentucky regulations tie eligibility for reduced in-state tuition to a person's classification as a "Kentucky resident." 13 Ky. Admin. Regs. 2:045, § 1(5). The regulations define a "Kentucky resident" as "a person determined by an institution for tuition purposes to be domiciled in, and a resident of, Kentucky as determined by this administrative regulation." *Id.* § 1(10). The regulation further states that "[a] person shall be a Kentucky resident for the purpose of this administrative regulation if the person graduated from a Kentucky high school and . . . [i]s an undocumented alien." *Id.* § 8(4)(a). The Kentucky Council added this provision, which we refer to as Section 8(4)(a), in 2002. 29 Ky. Admin. Reg. 749-751 (Sep. 2002).

### B. Factual Background

The United States brought this lawsuit against Kentucky Governor Beshear (in his official capacity), the Commissioner of the Kentucky Council (also in his official capacity), and the Kentucky Council itself, contending that Section 8(4)(a) is preempted by both § 1621 and § 1623. Compl., R. 1, Page ID # 1-2. After some reshuffling of parties not relevant here, including the dismissal of Governor Beshear, the remaining parties filed a Joint Motion for Entry of Consent Judgment declaring that Section 8(4)(a) violates the Supremacy Clause and enjoining the remaining state defendants from enforcing it. Mot., R. 24, Page ID # 112-113.

Also that same day, KSAT filed a motion to intervene to defend Section 8(4)(a). Mot. to Intervene, R. 27-1, Page ID # 125-141. The district court granted the motion. Order, R. 38, Page ID # 299, 303.

Following briefing and oral argument on the motion, the district court granted the Joint Motion for Entry of Consent Judgment and adopted the proposed consent judgment. Order, R. 57, Page ID # 454-475. The court held that it had jurisdiction to enter the consent judgment, *id.*, Page ID # 459-461. On the merits, the court declined to apply a presumption that the consent judgment was reasonable, *id.*, Page ID # 462-463, and proceeded to address the merits of the motion.

The district court concluded that Section 8(4)(a) was preempted by federal law because § 1621(d)'s language—"through the enactment of a State law after

August 22, 1996, which affirmatively provides for such eligibility"—refers only to statutes, not to regulations issued by an agency that "are not enacted by elected officials, nor . . . subject to presentment." Order, R. 57, Page ID # 473. Because that conclusion was sufficient to resolve this case, the court did not address the United States' argument that the regulation was preempted by § 1623(a). *Id.*, Page ID # 474.

## SUMMARY OF ARGUMENT

I. Although KSAT suggests that there is "a question as to whether the district court had jurisdiction to enter the proposed consent decree" because the United States and Kentucky agreed on the merits, Opening Br. 24 n.2, the court plainly had jurisdiction. The Supreme Court has squarely rejected the proposition that agreement between the parties on the unconstitutionality of a challenged provision divests the district court of jurisdiction to entertain a challenge to that provision. *See United States v. Windsor*, 570 U.S. 744, 758-59 (2013); *INS v. Chadha*, 462 U.S. 919, 939-40 (1983). The United States had standing to challenge Kentucky's preempted regulation, which state institutions were continuing to apply, and does not lose its entitlement to judicial relief merely because the state defendants agree with its position. KSAT's other suggestions that this Court lacks authority to reach the merits of this purely legal dispute are likewise without foundation.

II. As the district court held, § 1621(a) preempts the challenged regulation. Section 1621(a) sets forth a default rule that unlawfully present aliens are ineligible

for certain state and local public benefits, and KSAT does not dispute that the benefit here falls within that eligibility. KSAT thus relies entirely on Congress's direction that states could override the default rule through "enactment of a State law after August 22, 1996, which affirmatively provides for . . . eligibility" for a particular public benefit. 8 U.S.C. § 1621(d). The challenged regulation does not fall within this narrow exception. As a matter of plain text and ordinary parlance, § 1621(d) refers to legislation, not to any source that could be described as part of a body of state law. The term "enactment" connotes legislation, and, in any event, no one thinks a state agency is engaged in the "enactment of a State law" when it promulgates a regulation or that a state court is engaged in the "enactment of a State law" when the state court issues a decision. The statute's structure and directly-on-point legislative history—"[o]nly the affirmative enactment of a law by a State legislature and signed by the Governor after the date of enactment of this Act, that references this provision, will meet the requirements of this section"—confirm what the text makes clear. H.R. Rep. No. 104-725, at 383.

KSAT's constitutional arguments—whether framed as a contention that § 1621(d) violates the Tenth Amendment or in terms of constitutional avoidance—likewise lack merit. Contrary to KSAT's argument, § 1621(d) does not purport to override Kentucky's choices about how to structure its own government—indeed, it does not require Kentucky to do anything at all. It simply states the terms of an

exception to preemption, which states are free to avail or not avail themselves of. Such a provision raises no constitutional concerns.

III. Section 1623(a) also preempts the regulation. That statute provides that "an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State . . . for any postsecondary education benefit" for which nonresident U.S. citizens or nationals are ineligible. 8 U.S.C. § 1623(a). That provision preempts the challenged regulation because: (A) substantially reduced in-state tuition qualifies as a postsecondary education benefit; (B) Kentucky provides that benefit to unlawful aliens on the basis of residence; and (C) Kentucky does not provide that benefit to similarly situated U.S. citizens and nationals who are not residents of Kentucky. In the district court, KSAT did not meaningfully dispute either the first or third points, which are obvious. As to the second, the regulation itself defines what it is providing as "resident" tuition and provides that an unlawful alien "shall be a Kentucky resident" where the alien meets the regulation's requirements. And the definition of residence the regulation chooses—graduation from a Kentucky high school—as a practical matter almost perfectly coincides with domicile. KSAT's contrary argument would not just be contrary to § 1623(a)'s text but would result in a statute that would do almost nothing.

Also contrary to KSAT's argument in the district court, § 1623(a)—properly construed—does not violate the Tenth Amendment. Pursuant to its broad powers

over immigration and foreign affairs, Congress may direct that aliens who are not lawfully present in the United States are ineligible for benefits based on their (unlawful) residence within a state. And § 1623(a) does not have any other constitutionally problematic features. It does not commandeer state functions, *see Printz v. United States*, 521 U.S. 898 (1997), and does not issue any commands to state legislatures or any other organ of state government, *see Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453 (2018). It just preempts conflicting state law, which is the bread and butter of preemption legislation.

## STANDARD OF REVIEW

This Court reviews the district court's legal determinations de novo, including questions of statutory interpretation, *United States v. Lumbard*, 706 F.3d 716, 720 (6th Cir. 2013), and preemption, *GTE Mobilnet of Ohio v. Johnson*, 111 F.3d 469, 475 (6th Cir. 1997).

## ARGUMENT

### I. The district court had jurisdiction over this action and properly addressed the merits of the claim under § 1621.

KSAT includes in its brief a footnote asserting in cursory fashion that "[t]here is also a question as to whether the district court had jurisdiction to enter the proposed consent decree," because the parties to the decree agreed on the result (a fact which of course is true of all consent decrees—that is why they are called *consent* decrees). Opening Br. 24 n.2. Although this would not ordinarily be

sufficient to preserve a question for review, because the issue is jurisdictional, we address it here.

There can be no serious dispute that the district court had subject-matter jurisdiction over this case. It had statutory jurisdiction under 28 U.S.C. §§ 1331 and 1345, because this is a suit brought by the United States that arises under federal law. And KSAT could not plausibly dispute—and does not dispute—that the United States had Article III standing to challenge a state law that interferes with the immigration policy set out by Congress.

Instead, KSAT appears to argue that the state defendants stripped the district court of jurisdiction by adopting a litigating position that aligned with the position taken by the United States. But the Supreme Court has squarely rejected this argument. *See United States v. Windsor*, 570 U.S. 744, 758-59 (2013) (parties' agreement that Defense of Marriage Act was unconstitutional did not deprive the district court or appellate courts of jurisdiction where, among other things, the United States continued to comply with the statute and would not pay money to plaintiff absent a court order requiring it to do so); *INS v. Chadha*, 462 U.S. 919, 939-40 (1983) (parties' agreement that statute allowing one House of Congress to order the Executive to deport the respondent did not deprive courts of jurisdiction where the Executive would in fact deport the respondent unless courts prohibited it from doing so). Indeed, not even the dissenters in *Windsor* doubted that the district

court had jurisdiction notwithstanding the parties' agreement on the unconstitutionality of the Defense of Marriage Act; the dissent merely urged that there was no jurisdiction over the appeal once the parties got what they wanted. 570 U.S. at 781 (Scalia, J., dissenting) ("Windsor's injury was cured by the judgment in her favor."). That, of course, is not a point that KSAT raises here.

What mattered for jurisdictional purposes in both *Chadha* and *Windsor* is that the Supreme Court's decision would have real meaning (in *Chadha*, because the Executive would deport him if the law was upheld and in *Windsor*, because the Executive was refusing to pay the refund to which she claimed she was entitled). There is no dispute here that Kentucky institutions were providing in-state tuition to unlawful aliens pursuant to the regulation prior to this lawsuit and that the district court's decision remedies that injury to the United States.

A contrary position is also untenable on its face. On such a theory, the United States (or any other litigant) would lack a remedy against a state as to an unconstitutional provision whenever its counterparty expresses agreement on the merits of the United States' legal position—even if the provision continues to be enforced. Indeed, on this logic, a party could perhaps even immunize a regulation or allegedly unlawful practice merely by purporting to agree with a plaintiff's legal position. As the Supreme Court observed in rejecting this argument in *Chadha*, "it would be a curious result if, in the administration of justice, a person could be denied

access to the courts because the Attorney General of the United States agreed with the legal arguments asserted by the individual." 462 U.S. at 939. This case vividly illustrates the problem, as the record reflects that entities within Kentucky debated whether to withdraw the regulation rather than defend it nearly a month after the lawsuit was filed, *see* Order, R. 57, Page ID # 457; the fact that they ultimately declined to defend it because they agreed with the federal government's position provides no basis for *denying* relief to the federal government.

KSAT also briefly contends—albeit in its fact section, not its argument section—that it had an inadequate opportunity to litigate the issue of preemption under § 1621, under which the district court ultimately resolved the case. Even if that discussion were deemed sufficient to preserve an argument for review, *but see United States v. Smart*, 406 F. App'x 14, 17 n.3 (6th Cir. 2010) (unpublished), it would present no obstacle to this Court's resolution of the case on the merits. As KSAT acknowledges, "[t]he United States' Amended Complaint alleged that Section 8(4)(a) was preempted by both 8 U.S.C. § 1623(a) and 8 U.S.C. § 1621(d)," Opening Br. 18, KSAT addressed § 1621 in its opposition to the consent decree, Opening Br. 19, and the United States devoted multiple pages to § 1621 in its reply, *id.* That KSAT chose to address § 1621 only briefly does not mean that "the district court entered the consent judgment based on an issue KSAT did not have the opportunity to meaningfully argue or address." *Id.* And KSAT, in any event, has had

every opportunity to address the issue in its brief in this Court, and there would be no point to delaying this Court's resolution of that purely legal issue.

KSAT is likewise mistaken to suggest that the United States has forfeited any rights by not filing a cross-appeal. While it is unclear exactly what argument KSAT is referring to when it says that the federal government "forfeited any argument that the consent decree is not illegal,"[1] Opening Br. 25 n.3, the relevant point is made clear in KSAT's own parenthetical: cross-appeals are necessary only to alter the judgment. *See id.* Parties do not forfeit "arguments" by not cross-appealing. The United States is asking this Court to affirm the district court's judgment, not to alter it.

## II. Section 1621(a) preempts the challenged regulation.

The district court correctly held that § 1621 preempts the challenged regulation. Congress has exercised its authority to limit the eligibility of unlawfully present aliens for certain categories of benefits. With limited exceptions, such aliens are ineligible for federal benefits. *See* 8 U.S.C. § 1611. Such aliens are also ineligible for certain categories of state benefits as well, including, as relevant here, postsecondary education benefits. *See id.* § 1621(c)(1)(B).

---

[1] Contrary to KSAT, the district court also did not suggest that the consent decree was "illegal"—only that the decree was contrary to state law. But as the court held, and KSAT does not dispute, any state-law remedial limitations have no bearing on the United States' entitlement to seek invalidation of a state regulation as preempted by federal law.

Congress plainly has authority to determine the circumstances in which aliens are entitled to benefits. There is nothing constitutionally suspect about Congress—pursuant to its broad powers over immigration and foreign affairs—directing that aliens who are not lawfully present in the United States are ineligible for such benefits. *See Plyler v. Doe*, 457 U.S. 202, 225 (1982) ("Although it is a routine and normally legitimate part of the business of the Federal Government to classify on the basis of alien status, and to take into account the character of the relationship between the alien and this country, only rarely are such matters relevant to legislation by a State." (citations and quotation marks omitted)). As such, § 1621(a) is a legitimate exercise of Congress's undoubted authority to regulate immigration. As Congress has explained, "the availability of public benefits [should] not constitute an incentive for immigration to the United States," 8 U.S.C. § 1601(2)(B), and, as a matter of public policy, there "is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy" and "to remove the incentive for illegal immigration provided by the availability of public benefits," *id.* § 1601(5)-(6).

Congress concluded that it would allow states to override the federal prohibition and provide otherwise-ineligible aliens with benefits but only "through the enactment of a State law after August 22, 1996, which affirmatively provides for

. . . eligibility" for a particular public benefit. 8 U.S.C. § 1621(d). The text and content of this provision make clear that Congress set a default rule that can be overridden only by a legislative enactment. And contrary to KSAT, that default rule is constitutional.

**1.** Start with the text: "the enactment of a State law after August 22, 1996." The term "enactment" is, in its ordinary usage, limited to legislation. *See Enactment*, Black's Law Dictionary (12th ed. 2024) ("1. The action or process of making into law <enactment of a legislative bill>. 2. A statute <a recent enactment>."). And the term "law," when paired with "a," ordinarily refers to a statute—particularly the more specific terms, "a state law" or "a federal law." Combining these points, it would be exceedingly unnatural—indeed, bizarre—to refer to a state agency promulgating a regulation as the state agency's "enactment of a State law" or a federal agency doing the same as the federal agency's "enactment of a Federal law."

KSAT does not meaningfully engage with this full text but instead focuses more or less exclusively on two words of it—"State law." It observes that "State law" can refer to "'[a] body of law in a particular state consisting of the state's constitution, statutes, regulations, and common law.'" Opening Br. 25 (alteration in original) (emphasis omitted) (quoting *State Law*, Black's Law Dictionary (12th ed. 2024)). State law, it observes (quoting this Court), "includes the full range of a state's legislation, judicial precedents, and accepted legal principles." Opening Br. 26

(quoting *M.L. Johnson Fam. Props., LLC v. Bernhardt*, 924 F.3d 842, 851 (6th Cir. 2019)); *see also* Opening Br. 29 (contending that "state regulations are, in common understanding, a type of 'State law'" (quoting *State Law*, Black's Law Dictionary)).

This is both true and beside the point. The question is not the meaning of "'State law,' standing alone," Opening Br. 21, 26, but rather, the meaning of "the enactment of a State law after August 22, 1996," 8 U.S.C. § 1621(d). And the breadth of "State law" in general only confirms that "enactment of a State law" must mean legislation, not promulgation or issuance of any document that could broadly be described as constituting "State law." To take just one part of the sources KSAT cites, no one doubts that state judicial decisions—whether interpreting state statutes, interpreting the state constitution, or setting forth rules of state common law—are, in some broad sense, "state law." But no one would describe a state judicial decision as "enactment of a State law"—just as no one would describe this Court issuing a decision in this case as "enactment of a Federal law."

The structure of the statute also supports limiting § 1621(d) to legislation. The prior sub-sections of § 1621 prescribe a detailed scheme: setting forth a default rule that nonqualified aliens, with limited exceptions, are "not eligible for any State or local public benefit," 8 U.S.C. § 1621(a), defining in great detail the benefits to which that ineligibility applies, *id.* § 1621(c), and defining (likewise in great detail)

the exceptions, *id.* § 1621(b). Section 1621(d) then provides a procedure by which a state can override that scheme.

KSAT derides the district court's conclusion that this exception should be construed narrowly, Opening Br. 29, but the only logical way to interpret it is that it is limited in *some* meaningful respect. With respect to state benefits, the federal eligibility bar only has any practical effect insofar as, *absent* the federal statute, nonqualified aliens *would* be eligible for the relevant benefit under state law. So it would make no sense for Congress to set forth a highly detailed scheme restricting eligibility for state and local benefits, while at the same time providing without limitation that the scheme would cease to apply if state law *in any form* directed otherwise. The only sensible reading of the text, which also makes eminent sense as a policy matter, is that states may override this carefully considered scheme only by accepting political accountability for that step through enactment of legislation by a popularly elected legislature following § 1621's passage.

And to the extent legislative history is relevant, it is directly on point and makes clear that this is exactly what Congress intended. The Conference Report stated that "[o]nly the affirmative enactment of a law by a State legislature and signed by the Governor after the date of enactment of this Act, that references this provision, will meet the requirements of this section." H.R. Rep. No. 104-725, at 383.

Kentucky did not do that here. The Kentucky in-state tuition statute does not mention unlawful aliens at all. Ky. Rev. Stat. Ann. § 164.020(8)(a). And there is no indication that the Kentucky legislature has determined that unlawful aliens should be eligible for in-state tuition—either before or after August 22, 1996.

**2.a.** However interpreted, § 1621(d) does not violate the Tenth Amendment. KSAT contends that, if construed as limited to statutes, § 1621(d) would amount to "a congressional attempt to restructure Kentucky government – specifically, its rules on delegation of state lawmaking authority." Opening Br. 35. Section 1621(d) does no such thing. It does not require the Kentucky legislature to rescind any delegation to the Kentucky Council. *Contra* Opening Br. 37. Indeed, it does not require Kentucky legislature to do anything.

Indeed, in enacting 8 U.S.C. § 1621(d), Congress did not purport to strip Kentucky of authority that it would otherwise have enjoyed. Congress was under no obligation to accommodate state interests at all when establishing aliens' eligibility for public benefits: it could have established a prohibition on the receipt of benefits without affording the states an opportunity to create a limited exception to the prohibition.

Congress instead chose to allow states additional policy flexibility it was under no obligation to provide—but with a reasonable condition. Congress chose to allow states to override the otherwise applicable prohibition in § 1621(d) but only

when a state legislature concludes that it is appropriate to make state or local benefits available to particular aliens. The grant of authority to the state legislatures in this area of traditional federal concern cannot plausibly be characterized as an interference with state government. Rather than intruding on the states' right to "remain independent and autonomous within their proper sphere of authority," *Printz v. United States*, 521 U.S. 898, 928 (1997), Congress has here accorded state interests an additional measure of respect by granting states the authority to regulate in this area, if they so choose, by enacting a law establishing the eligibility of additional aliens. The Constitution does not compel Congress to allow states to take advantage of that accommodation in ways that would not satisfy Congress's desired condition of clear political accountability by a popularly elected body.

The federal scheme at issue here is best analogized to that in *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264 (1981), where the Supreme Court held that Congress could permissibly create a regulatory scheme that would apply unless a state implemented its own regulatory scheme *that satisfied certain federal requirements*. The Court noted that "Congress could constitutionally have enacted a statute prohibiting any state regulation of surface coal mining" and held that the federal statute did not "become constitutionally suspect simply because Congress chose to allow the States a regulatory role." *Id.* at 290. In the same way, § 1621 does no more than authorize the states to impose their own regulations,

subject to certain conditions. As in *Hodel*, states can determine whether they wish to take advantage of the flexibility Congress provided but must do so on the terms set out by Congress.

KSAT does not advance its argument by relying on *Nixon v. Missouri Municipal League*, 541 U.S. 125 (2004). There, the Supreme Court read a federal law that preempted state laws prohibiting entities from providing telecommunications services to apply only to laws that affected private entities, as opposed to subdivisions of the state. The Court's analysis focused on the oddity of prohibiting a state from stripping authority that the state had no obligation to provide in the first place—an issue absent from this case—and a concern about preventing states from allocating power as they see fit, which likewise has no application here because the federal statute merely creates a default rule and leaves the full menu of options available to the state legislature should it choose to act.

Finally on this point, even if KSAT were correct that § 1621(d) violates the Tenth Amendment, it is far from clear that such a conclusion would warrant the relief KSAT seeks here. KSAT simply assumes that the remedy would be a judicial rewrite to *expand* § 1621(d) to cover state benefits that Congress expressly did not wish to shield from preemption under § 1621(a)—as opposed to simply invalidating § 1621(d) in its entirety, which would eliminate all state authority to make

exceptions. But since KSAT's constitutional objections are insubstantial, the Court need not address that hypothetical remedial issue.

In sum, federal law requires that the exemption KSAT seeks take the form of an enactment by the Kentucky State Legislature. Their contention that this requirement violates the Tenth Amendment is without basis.

**b.** KSAT's constitutional objections fare no better if framed in terms of constitutional avoidance. Opening Br. 34 (contending both that the district court's interpretation violates the Tenth Amendment and also that "[t]he well-established doctrine of constitutional avoidance also leads to the conclusion that 'State law' includes duly-enacted regulation under Section 1621(d)"). The statute is clear and KSAT's constitutional objections are insubstantial. And "a weak constitutional argument and a weak statutory argument do not add up to a strong constitutional avoidance argument." *United States v. Blewett*, 746 F.3d 647, 660 (6th Cir. 2013) (en banc), *superseded by statute on other grounds as stated in United States v. Richardson*, 960 F.3d 761, 763 (6th Cir. 2020) (per curiam).

## III. Section 1623(a) also preempts Kentucky's regulation making unlawful aliens eligible for in-state tuition.

Though the district court did not reach the issue, § 1623(a) also preempts the challenged regulation. Section 1623(a) provides that "an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State . . . for any postsecondary education benefit unless a citizen or national of the

United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident." 8 U.S.C. § 1623(a). And since it applies "[n]otwithstanding any other provision of law," § 1623(a) preempts the challenged regulation regardless of whether the regulation qualifies as a state law enacted after August 22, 1996, for purposes of the separate restriction found in 8 U.S.C. § 1621.

Section 1623(a) straightforwardly preempts the challenged regulation. As discussed below, (A) the challenged regulation provides for in-state tuition, which is a postsecondary education benefit; (B) the regulation purports to make unlawful aliens eligible for that benefit on the basis of residence; (C) in-state tuition is not, of course, provided to non-resident United States citizens and nationals; and (D) properly construed and contrary to KSAT's argument below, § 1623(a) does not run afoul of the Tenth Amendment or otherwise exceed Congress's constitutional authority.

**A. In-state tuition is a post-secondary education benefit.**

The Kentucky scheme provides a "postsecondary education benefit" to unlawfully present aliens—KSAT has not contended otherwise. Substantially reduced tuition is obviously a "benefit," in both the dictionary and everyday use of the term. *See Benefit*, Black's Law Dictionary (12th ed. 2024) (an "advantage or privilege something gives"); *Benefit*, Merriam-Webster Online Dictionary,

https://www.merriam-webster.com/dictionary/benefit (last visited Sep. 8, 2026) ("something that produces good or helpful results or effects or that promotes well-being"); *Benefit*, Merriam-Webster's Collegiate Dictionary, at 106 (10th ed. 1997) ("ADVANTAGE" or "useful aid"). And it is a "postsecondary education" benefit—*i.e.*, it is a benefit for education after high school. And even putting aside dictionary definitions, any ordinary reader with even a baseline understanding of college education in the United States (in 1996 or 2026) would instantly understand the relevant language—"eligible on the basis of residence within a State . . . for any postsecondary education benefit"—to encompass, and indeed likely be meant specifically to refer to, in-state tuition.

Although the text is clear and no recourse to legislative history is needed, that history simply could not be clearer that Congress intended for § 1623 to encompass in-state tuition rates. Indeed, the principal purpose of the provision was to preempt precisely the scheme embodied in the challenged regulation. A House conference committee report, commenting on the language that was ultimately enacted as § 1623, states that "[t]his section provides that illegal aliens are not eligible for in-state tuition rates at public institutions of higher education." H.R. Rep. No. 104-828, at 240 (1996) (Conf. Rep.).

### B. The regulation provides benefits "on the basis of residence" within Kentucky.

The challenged regulation also provides in-state tuition on the basis of residence. That, too, could not be more straightforward. Kentucky, like most other states, has elected to provide postsecondary education at its state institutions at markedly reduced rates for Kentuckians, as opposed to out-of-state students. *See* Univ. of Ky., *2026-2027 Estimated Cost of Attendance*, *supra* (estimating undergraduate tuition and fees of $14,178 for in-state students and $35,846 for out-of-state students). And consistent with a Kentucky statute, *see* Ky. Rev. Stat. Ann. § 164.020(8)(a), the regulations tie eligibility for reduced in-state tuition to a person's classification as a "Kentucky resident." 13 Ky. Admin. Regs. 2:045, § 1(5). The regulations define a "Kentucky resident" as "a person determined by an institution for tuition purposes to be domiciled in, and a resident of, Kentucky as determined by this administrative regulation." *Id.* § 1(10). The regulation at issue here further states that "[a] person *shall be a Kentucky resident* for the purpose of this administrative regulation if the person graduated from a Kentucky high school and . . . [i]s an undocumented alien." *Id.* § 8(4)(a) (emphasis added).

KSAT contended in the district court that the challenged regulation does not provide in-state tuition "on the basis of residence within" Kentucky because, even though the regulation explicitly declares that such an undocumented alien "shall be a Kentucky resident," "[a] high school graduation requirement is not the same as a

residence requirement." KSAT Opp'n to Joint Mot. for Entry of Consent J., R. 43, Page ID # 364. But graduation from a Kentucky high school is simply how the regulation defines residence for purposes of unlawfully present aliens' eligibility for in-state tuition. A state might define residence for purpose of in-state tuition in any number of ways: filing of an income tax return in the state, holding a state driver's license, being registered to vote in the state, some combination of these ties to the state, or other factors. Section 1623(a) is entirely agnostic on how the state determines who gets to pay resident tuition. Its plain meaning is simply that, when a state establishes a scheme under which state residents who are U.S. citizens are charged one price and those who live elsewhere are charged more, aliens who are not lawfully present in the United States are not eligible for the lower rate.[2]

The regulation's choice to provide in-state tuition based on high school attendance and graduation within Kentucky, moreover, reflects a commonsense understanding of residence. KSAT cannot seriously dispute that virtually every Kentucky high school graduate will in fact have resided in Kentucky while they attended school there. Defining residence in terms of the high school of graduation rather than in terms of domicile makes essentially no practical difference and does

[2] A federal district court in Minnesota recently accepted a similar argument in a challenge to a Minnesota statute. *See United States v. Walz*, 825 F. Supp. 3d 897 (D. Minn. 2026), *appeal docketed*, No. 26-1886 (8th Cir. May 7, 2026). That decision, which the United States is appealing, is incorrect substantially for reasons discussed here.

not entitle the Kentucky Council to evade a federal law that expressly preempts the policy choice that the Council attempted to make.

KSAT further contended that "Section 1623(a) prohibits states from offering postsecondary education to undocumented immigrants on the basis of 'residence'; not something 'like' residence, a 'proxy' for residence, or a classification that would include 'too many' residents." KSAT Opp'n to Joint Mot. for Entry of Consent J., R. 43, Page ID # 364. But for one, as noted, the regulation uses graduation from a Kentucky high school as its *definition* of residence for unlawful aliens, not as a proxy or replacement for it. And in any event, in a wide variety of other contexts involving statutory and constitutional discrimination claims, courts routinely conclude that use of a proxy constitutes making a determination based on the relevant trait itself. *See, e.g.*, *Anderson v. Crouch*, 169 F.4th 474, 484 (4th Cir. 2026) (noting that "even a facially neutral classification may warrant heightened scrutiny if it uses a proxy to camouflage intentional discrimination based on a protected trait"); *Bryan v. Government of the Virgin Islands*, 916 F.3d 242, 246 (3d Cir. 2019) (explaining that the "employer may not use a direct proxy for age to discriminate surreptitiously against older workers"); *Pacific Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013) (similar). "The dispositive question" in such cases is whether the impermissible "purpose has, at least in some measure, shaped" the action at issue. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 276 (1979);

*cf. Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 230 (2023) ("[W]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows, and the prohibition against racial discrimination is levelled at the thing, not the name." (alteration in original) (quotation marks omitted)). The question is again not necessary to address here because the regulation itself *frames* what it is doing as providing "resident" tuition. But even if it had not, the regulation cannot work around the Supremacy Clause through creative wordsmithing. The state regulation here has the purpose and effect of offering lower tuition to Kentucky students than to out-of-state students and that is precisely what Congress addressed when it prohibited providing a benefit on the basis of residence.

In district court, KSAT also purported to derive significance from the Immigration and Nationality Act's (INA) definition of "residence." *See* 8 U.S.C. § 1101(a)(33). KSAT reasoned that, because the INA defines residence as "the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent," *id.*, the federal statute "only preempts state law where a state law grants regular tuition rates to students without lawful immigration status based on their 'actual dwelling place in fact.'" KSAT Opp'n to Joint Mot. for Entry of Consent J., R. 43, Page ID # 363 (quoting 8 U.S.C. § 1101(a)(33)). But § 1623(a) refers to a state's determination of "residence within

a state," not to "residence" in the abstract. Section 1623(a) thus does not depend on who is a resident under federal law but rather on who receives a state benefit "on the basis of residence." And that depends on the state's definition, not the federal one. Indeed, it is hard to imagine a circumstance where a state would determine whether an individual is entitled to in-state tuition by applying the INA's definition of residence, and there is no reason to believe that Congress would have presumed otherwise. Although IIRIRA incorporates the INA's definition in the chapter that contains § 1623, *see* 8 U.S.C. § 1641(a), that definition (and IIRIRA's incorporation of it) serves a very different purpose—defining who qualifies as a permanent resident and is otherwise qualified for *federal* programs and benefits. *See, e.g.*, *id.* §§ 1611-1612, 1621.

Finally on this point, even if KSAT's interpretation was one possible reading of the statutory text, "Congress does not ordinarily enact self-defeating statutes." *Exxon Mobil Corp. v. Corporación Cimex, S.A. (Cuba)*, 146 S. Ct. 1909, 1919 (2026); *accord Quarles v. United States*, 587 U.S. 645, 654 (2019) ("We should not lightly conclude that Congress enacted a self-defeating statute."); *Abramski v. United States*, 573 U.S. 169, 181 (2014) (rejecting interpretation that would render statute "utterly ineffectual"). KSAT's interpretation would produce a number of nonsensical results that make no practical sense and that would almost completely neuter § 1623(a).

For one, it would allow § 1623(a) to be evaded by the adoption of a classification that is almost perfectly correlated with residence and is intended to serve the exact same purposes. There is no logical reason to read § 1623(a) that way. Worse still, on KSAT's apparent view, a state law would be preempted only if it happened to copy and paste § 1101(a)(33) directly into the state code or code of regulations—or at the very least, only if it defined the students eligible for in-state tuition using a definition of residence that is identical to § 1101(a)(33)'s definition in all material respects. There is no reason to expect a state to do that and, even if it did, that would make federal preemption turn entirely on immaterial and meaningless happenstance—a state's drafting choices in how it specifically determined residence. And a state whose scheme was preempted could avoid preemption entirely by slightly tweaking the definition of residence, even if that change made no meaningful difference.

Indeed, on KSAT's view, a state could avoid preemption by *expanding* the number of unlawful aliens eligible for in-state tuition. If a state, for example, defined residence in terms of a dwelling place, but not a "principal" dwelling place as the federal definition does, 8 U.S.C. § 1101(a)(33), thus sweeping in slightly more unlawfully present aliens, the entire federal scheme would apparently be nullified. And in fact, KSAT urged in district court that, if "the regulation requires undocumented students to both graduate from a Kentucky high school and reside in

Kentucky in order to be eligible, it should sever the offending residency requirement," KSAT Opp'n to Joint Mot. for Entry of Consent J., R. 43, Page ID # 364 n.7—in effect using § 1623(a) as a sword to make more unlawful aliens eligible for post-secondary education benefits. None of this makes any sense.

### C. The regulation does not provide the same benefits to citizens and nationals of the United States who are not residents of Kentucky.

As noted, an unlawfully present alien is eligible for postsecondary education benefits on the basis of residence only insofar as "a citizen or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such a resident." 8 U.S.C. § 1623(a). There should be no room for serious dispute that in-state tuition is not a benefit that is available to out-of-state American citizens and nationals. That is inherent in a distinction between in-state and out-of-state tuition. Unlawful aliens who are "Kentucky resident[s]," 13 Ky. Admin. Regs. 2:045, § 1(10) (quotation marks omitted), are permitted to attend college at significantly lower tuition rates than U.S. citizens and nationals who are "Nonresident[s]," *id.* § 1(11) (quotation marks omitted). That differential treatment conflicts with § 1623(a).

In the district court, without squarely disputing the point, KSAT observed that Kentucky's regulations also make some narrow categories of individuals eligible for in-state tuition without regard to their residence, including "[a] person eligible for

benefits under the federal Post-9/11 Veterans Educational Assistance Act of 2008, 38 U.S.C. [§§] 3301-3325," 13 Ky. Admin. Regs. 2:045, § 7(4), and beneficiaries of Kentucky Educational Savings Plan Trust, *id.* § 9. But § 1623(a) provides that: (i) "*an*" unlawfully present alien; (ii) is not eligible on the basis of state residence "for any postsecondary education benefit" unless; (iii) "a" U.S. citizen or national is eligible; (iv) "for *such* a benefit"; (v) "in no less an amount, duration, and scope"; (vi) without regard to whether the citizen or national is such a resident. 8 U.S.C. § 1623(a) (emphases added). The meaning of that parallel structure is straightforward. A particular unlawfully present alien is eligible for a particular benefit only to the same extent that an identically situated nonresident citizen or national is eligible for that benefit, and in no greater an amount, duration, and scope.

So, to take the example above, because Kentucky provides in-state tuition to citizens who are eligible for benefits under the Post-9/11 Veterans Educational Assistance Act of 2008 without regard to residence, unlawful aliens who are eligible for benefits under this statute remain eligible for in-state tuition. Or to take a different, hypothetical example, if Kentucky—in an effort to attract top out-of-state students—made in-state tuition available to U.S. citizens and nationals with perfect SAT scores irrespective of residence, unlawful aliens residing in Kentucky *with perfect SAT scores* would remain eligible for in-state tuition under that hypothetical statute.

Applying that framework here is straightforward. The categorical eligibility for in-state tuition at issue here can stand only if the same benefit were made available to all U.S. citizens irrespective of residence—which it concededly does not. But the federal statute plainly does not mean that, if a state makes a single nonresident citizen or national eligible for in-state tuition, § 1623(a) no longer applies and unlawful aliens are categorically eligible. As the Fifth Circuit correctly noted, "[e]ligibility for one U.S. citizen or national in a discrete circumstance cannot unlock preferential in-state tuition for all illegal aliens when other citizens or nationals are excluded from consideration." *United States v. Texas*, 181 F.4th 548, 558 (5th Cir. 2026).[3] Again, that conclusion follows from § 1623(a)'s plain text but is also the only reading that makes any practical sense. There is no plausible theory under which Congress could have on the one hand wanted to make unlawful aliens ineligible for state postsecondary education benefits on the basis of state residence but on the other hand wished to restore that eligibility if a single nonresident U.S. citizen or national were made eligible for that benefit.

---

[3] Judge Ramirez dissented in *Texas*. But she did not appear to dispute that the challenged Texas provisions conflict with § 1623(a), as does the regulation here. Rather, she questioned whether the district court had jurisdiction over the United States' lawsuit against Texas because the parties agreed upon the proper outcome, and because she believed § 1623(a) is unconstitutional. 181 F.4th at 566-68, 570-73 (Ramirez, J., dissenting). For reasons discussed in this brief, neither of these contentions has merit.

### D. KSAT's constitutional and constitutional avoidance arguments lack merit.

In district court, KSAT argued that the regulation should be upheld to avoid constitutional concerns under the Tenth Amendment. But the federal statute is unambiguous and raises no constitutional concerns. As discussed with respect to § 1621, Congress plainly has authority to determine the circumstances in which aliens are entitled to benefits. The constitutional basis for § 1623 is similarly straightforward. *See supra* pp. 15-17.

In the district court, KSAT invoked the Supreme Court's decision in *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453 (2018), for the proposition that Congress may not tell a state what it "may and may not do," *id.* at 474. But the point of *Murphy* was that Congress could not force a state *to legislate*. Specifically, by providing that a state could not "authorize by law or compact . . . a lottery, sweepstakes, or other betting, gambling, or wagering scheme based . . . on" competitive sporting events, 28 U.S.C. § 3702, Congress purported to require states to make certain conduct illegal under state law, *Murphy*, 584 U.S. at 474-75; *see also id.* at 475 (characterizing law as "command[ing] state legislatures to enact or refrain from enacting state law"). The Court made clear, however, that Congress could preempt state law by providing or eliminating a right or obligation held by private citizens that the state would otherwise have afforded or withheld. Section 1623(a) is thus a textbook case of what the Supreme Court described as an ordinary,

valid preemption law: "Congress enacts a law that imposes restrictions or confers rights on private actors" (here, restrictions on the receipt of certain benefits); "a state law confers rights or imposes restrictions that conflict with the federal law" (here, a right to in-state tuition); "and therefore the federal law takes precedence and the state law is preempted." *Id.* at 477.

And the more basic point is that § 1623(a) is *self-executing*. It makes unlawful aliens ineligible for benefits under the circumstances where it applies, and it preempts contrary state laws—*without requiring* any intervening steps by states or their legislatures. That does not amount to a command to legislate or refrain from legislating. And extending *Murphy* to this entirely ordinary preemption provision would have no logical limit, since the dynamic KSAT describes—a federal statute sweeping aside contrary state law—is true of all preemption provisions.

KSAT thus attempted to frame its Tenth Amendment argument by asserting that, because § 1623(a) makes unlawfully present aliens eligible for in-state tuition based on residence only insofar as nonresident citizens and nationals are eligible, "states that want to provide educational benefits to undocumented students based on their residency within the state, must change their laws to also provide those same benefits to all United States citizens or nationals," which KSAT framed as a command to legislate. KSAT Opp'n to Joint Mot. for Entry of Consent J., R. 43, Page ID # 366. This argument is insubstantial and again has no logical limit. All

preemption provisions, insofar as they preempt some state laws but not others, give states an option to amend its laws to fall outside the scope of the preemption provision. That is not tantamount to the problem the Court perceived in *Murphy*—a federal statute that literally commanded state legislatures to legislate or refrain from legislating on a particular subject.

In any event, it would have been within Congress's constitutional authority to simply make unlawful aliens categorically ineligible, for reasons discussed above. Nothing in the Constitution precludes Congress from affording states *additional* policy flexibility in this way. *Cf. Hodel*, 452 U.S. at 290 (where "Congress could constitutionally have enacted a statute prohibiting any state regulation of surface coal mining," "[w]e fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role").

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

*/s/Andrew M. Bernie*

ANDREW M. BERNIE
*Attorneys, Appellate Staff*
*Civil Division, Room 7539*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3511*
*andrew.bernie@usdoj.gov*

September 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,011 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font.

*s/ Andrew M. Bernie*
Andrew M. Bernie

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 28(b)(1)(A)(i), the United States designates the following district court documents as relevant:

| Record Entry | Description | Page ID # Range |
|---|---|---|
| 1 | United States' Complaint | 1-14 |
| 4 | United States' Amended Complaint | 30-43 |
| 24 | Joint Motion for Entry of Consent Judgment | 112-115 |
| 25 | Proposed Consent Judgment | 116 |
| 38 | Order Granting KSAT's Motion to Intervene | 286-304 |
| 43 | KSAT's Response in Opposition to Joint Motion for Entry of Consent Judgment | 356-374 |
| 48 | United States' Reply in Support of Joint Motion for Entry of Consent Judgment | 384-404 |
| 57 | Memorandum Opinion & Order Granting Joint Motion for Entry of Consent Judgment and Adopting Proposed Consent Judgment | 454-475 |
| 58 | Notice of Appeal | 476-477 |

# ADDENDUM

# TABLE OF CONTENTS

8 U.S.C. § 1621 ............................................................ A1

8 U.S.C. § 1623 ............................................................ A3

13 Ky. Admin. Regs. 2:045 ................................................ A4

**8 U.S.C. § 1621**

**§ 1621. Aliens who are not qualified aliens or nonimmigrants ineligible for State and local public benefits**

**(a) In general**

Notwithstanding any other provision of law and except as provided in subsections (b) and (d), an alien who is not--

**(1)** a qualified alien (as defined in section 1641 of this title),

**(2)** a nonimmigrant under the Immigration and Nationality Act, or

**(3)** an alien who is paroled into the United States under section 212(d)(5) of such Act for less than one year,

is not eligible for any State or local public benefit (as defined in subsection (c)).

**(b) Exceptions**

Subsection (a) shall not apply with respect to the following State or local public benefits:

**(1)** Assistance for health care items and services that are necessary for the treatment of an emergency medical condition (as defined in section 1396b(v)(3) of Title 42) of the alien involved and are not related to an organ transplant procedure.

**(2)** Short-term, non-cash, in-kind emergency disaster relief.

**(3)** Public health assistance for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease.

**(4)** Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General, in the Attorney General's sole and unreviewable discretion after consultation with appropriate Federal agencies and departments, which (A) deliver in-kind services at the community level, including through public or private nonprofit agencies; (B) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (C) are necessary for the protection of life or safety.

**(c) "State or local public benefit" defined**

**(1)** Except as provided in paragraphs (2) and (3), for purposes of this subchapter the term "State or local public benefit" means--

**(A)** any grant, contract, loan, professional license, or commercial license provided by an agency of a State or local government or by appropriated funds of a State or local government; and

**(B)** any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government.

**(2)** Such term shall not apply--

**(A)** to any contract, professional license, or commercial license for a nonimmigrant whose visa for entry is related to such employment in the United States, or to a citizen of a freely associated state, if section 141 of the applicable compact of free association approved in Public Law 99-239 or 99-658 (or a successor provision) is in effect;

**(B)** with respect to benefits for an alien who as a work authorized nonimmigrant or as an alien lawfully admitted for permanent residence under the Immigration and Nationality Act qualified for such benefits and for whom the United States under reciprocal treaty agreements is required to pay benefits, as determined by the Secretary of State, after consultation with the Attorney General; or

**(C)** to the issuance of a professional license to, or the renewal of a professional license by, a foreign national not physically present in the United States.

**(3)** Such term does not include any Federal public benefit under section 1611(c) of this title.

**(d) State authority to provide for eligibility of illegal aliens for State and local public benefits**

A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility.

**8 U.S.C. § 1623**

**§ 1623. Limitation on eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education benefits**

**(a) In general**

Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

**(b) Effective date**

This section shall apply to benefits provided on or after July 1, 1998.

**13 Ky. Admin. Regs. 2:045**

**13 KAR 2:045. Determination of residency status for admission and tuition assessment purposes**

Section 1. Definitions.

(1) “Academic term” means a division of the school year during which a course of studies is offered, and includes a semester, quarter, or single consolidated summer term as defined by the institution.

(2) “Continuous enrollment” means enrollment in a state-supported postsecondary education institution at the same degree level for consecutive terms, excluding summer term, since the beginning of the period for which continuous enrollment is claimed unless a sequence of continuous enrollment is broken due to extenuating circumstances beyond the student's control, such as serious personal illness or injury, or illness or death of a parent.

(3) “Degree level” means enrollment in a course or program that could result in the award of a:

(a) Certificate, diploma, or other program award at an institution;

(b) Baccalaureate degree or lower, including enrollment in a course by a nondegree-seeking post baccalaureate student;

(c) Graduate degree or graduate certification other than a first-professional degree in law, medicine, dentistry, or “Pharm. D”; or

(d) Professional degree in law, medicine, dentistry, or “Pharm. D”.

(4) “Dependent person” means a person who cannot demonstrate financial independence from parents or persons other than a spouse and who does not meet the criteria for independence established in Section 5 of this administrative regulation.

(5) “Determination of residency status” means the decision of a postsecondary education institution that results in the classification of a person as a Kentucky resident or as a nonresident for admission and tuition assessment purposes.

(6) "Domicile" means a person's true, fixed, and permanent home and is the place where the person intends to remain indefinitely, and to which the person expects to return if absent without intending to establish a new domicile elsewhere.

(7) "Full-time employment" means continuous employment for at least forty-eight (48) weeks at an average of at least thirty (30) hours per week.

(8) "Independent person" means a person who demonstrates financial independence from parents or persons other than a spouse and who meets the criteria for independence established in Section 5 of this administrative regulation.

(9) "Institution" means an entity defined by KRS 164.001(12) if the type of institution is not expressly stated and includes the Kentucky Virtual University, the Council on Postsecondary Education, and the Kentucky Higher Education Assistance Authority.

(10) "Kentucky resident" means a person determined by an institution for tuition purposes to be domiciled in, and a resident of, Kentucky as determined by this administrative regulation.

(11) "Nonresident" means a person who:

(a) Is domiciled outside Kentucky;

(b) Currently maintains legal residence outside Kentucky; or

(c) Is not a Kentucky resident as determined by this administrative regulation.

(12) "Parent" means one (1) of the following:

(a) A person's father or mother; or

(b) A court-appointed legal guardian if:

1. The guardianship is recognized by an appropriate court within the United States;

2. There was a relinquishment of the rights of the parents; and

3. The guardianship was not established primarily to confer Kentucky residency on the person.

(13) "Preponderance of the evidence" means the greater weight of evidence or evidence that is more credible and convincing to the mind.

(14) "Residence" means the place of abode of a person and the place where the person is physically present most of the time for a noneducational purpose in accordance with Section 3 of this administrative regulation.

(15) "Student financial aid" means all forms of payments to a student if one (1) condition of receiving the payment is the enrollment of the student at an institution, and includes student employment by the institution or a graduate assistantship.

(16) "Sustenance" means:

(a) Living expenses, such as room, board, maintenance, and transportation; and

(b) Educational expenses, such as tuition, fees, books, and supplies.

Section 2. Scope.

(1) State-supported postsecondary education institutions were established and are maintained by the Commonwealth of Kentucky primarily for the benefit of qualified residents of Kentucky. The substantial commitment of public resources to postsecondary education is predicated on the proposition that the state benefits significantly from the existence of an educated citizenry. As a matter of policy, access to postsecondary education shall be provided so far as feasible at reasonable cost to a qualified individual who is domiciled in Kentucky and who is a resident of Kentucky.

(2) In accordance with the duties established in KRS 164.020, the Council on Postsecondary Education may require a student who is neither domiciled in, nor a resident of, Kentucky to meet higher admission standards and to pay a higher level of tuition than resident students.

(3) Unless otherwise indicated, this administrative regulation shall apply to all student residency determinations, regardless of circumstances, including residency determinations made by:

(a) The state-supported institutions for prospective and currently-enrolled students;

(b) The Southern Regional Education Board for contract spaces;

(c) Reciprocity agreements, if appropriate;

(d) The Kentucky Virtual University;

(e) Academic common market programs;

(f) The Kentucky Educational Excellence Scholarship Program; and

(g) Other state student financial aid programs, as appropriate.

Section 2. Scope.

(1) State-supported postsecondary education institutions were established and are maintained by the Commonwealth of Kentucky primarily for the benefit of qualified residents of Kentucky. The substantial commitment of public resources to postsecondary education is predicated on the proposition that the state benefits significantly from the existence of an educated citizenry. As a matter of policy, access to postsecondary education shall be provided so far as feasible at reasonable cost to a qualified individual who is domiciled in Kentucky and who is a resident of Kentucky.

(2) In accordance with the duties established in KRS 164.020, the Council on Postsecondary Education may require a student who is neither domiciled in, nor a resident of, Kentucky to meet higher admission standards and to pay a higher level of tuition than resident students.

(3) Unless otherwise indicated, this administrative regulation shall apply to all student residency determinations, regardless of circumstances, including residency determinations made by:

(a) The state-supported institutions for prospective and currently-enrolled students;

(b) The Southern Regional Education Board for contract spaces;

(c) Reciprocity agreements, if appropriate;

(d) The Kentucky Virtual University;

(e) Academic common market programs;

(f) The Kentucky Educational Excellence Scholarship Program; and

(g) Other state student financial aid programs, as appropriate.

(2) An initial determination of residency status shall be based upon:

(a) The facts in existence when the credentials established by an institution for admission for a specific academic term have been received and during the period of review by the institution;

(b) Information derived from admissions materials;

(c) If applicable, other materials required by an institution and consistent with this administrative regulation; and

(d) Other information available to the institution from any source.

(3) An individual seeking a determination of Kentucky residency status shall demonstrate that status by a preponderance of the evidence.

(4) A determination of residency status shall be based upon verifiable circumstances or actions.

(5) Evidence and information cited as the basis for Kentucky domicile and residency shall accompany the application for a determination of residency status.

(6) A student classified as a nonresident shall retain that status until the student is officially reclassified by an institution.

(7) A student may apply for a review of a determination of residency status once for each academic term.

(8) If an institution has information that a student's residency status may be incorrect, the institution shall review and determine the student's correct residency status.

(9) If the Council on Postsecondary Education has information that an institution's determination of residency status for a student may be incorrect, it may require the institution to review the circumstances and report the results of that review.

(10) An institution shall impose a penalty or sanction against a student who gives incorrect or misleading information to an institutional official, including payment of nonresident tuition for each academic term for which resident tuition was assessed based on an improper determination of residency status. The penalty or sanction may also include:

(a) Student discipline by the institution through a policy written and disseminated to students; or

(b) Criminal prosecution.

Section 4. Presumptions Regarding Residency Status.

(1) In making a determination of residency status, it shall be presumed that a person is a nonresident if:

(a) A person is, or seeks to be, an undergraduate student and admissions records show the student to be a graduate of an out-of-state high school within five (5) years prior to a request for a determination of residency status;

(b) A person's admissions records indicate the student's residence to be outside of Kentucky when the student applied for admission;

(c) A person moves to Kentucky primarily for the purpose of enrollment in an institution;

(d) A person moves to Kentucky and within twelve (12) months enrolls at an institution more than half time;

(e) A person has a continuous absence of one (1) year from Kentucky; or

(f) A person attended an out-of-state higher education institution during the past academic year and paid in-state tuition at that institution.

(2) A presumption arising from subsection (1) of this section shall only be overcome by preponderance of evidence sufficient to demonstrate that a person is domiciled in and is a resident of Kentucky.

(2) A presumption arising from subsection (1) of this section shall only be overcome by preponderance of evidence sufficient to demonstrate that a person is domiciled in and is a resident of Kentucky.

Section 5. Determination of Whether a Student is Dependent or Independent.

(1) In a determination of residency status, an institution shall first determine whether a student is dependent or independent. This provision shall be predicated on the assumption that a dependent person lacks the financial ability to live independently of the person upon whom the student is dependent, and therefore, lacks the ability to form the requisite intent to establish domicile. A determination that a student is independent shall be one (1) step in the overall determination of whether a student is or is not a resident of Kentucky.

(2) In determining the dependent or independent status of a person, the following information shall be considered, as well as other relevant information available when the determination is made:

(a) 1. Whether the person has been claimed as a dependent on the federal or state tax returns of a parent or other person for the year preceding the date of application for a determination of residency status; or

2. Whether the person is no longer claimed by a parent or other person as a dependent or as an exemption for federal and state tax purposes; and

(b) Whether the person has financial earnings and resources independent of a person other than an independent spouse necessary to provide for the person's own sustenance.

(3) An individual who enrolls at an institution immediately following graduation from high school and remains enrolled shall be presumed to be a dependent person unless the contrary is evident from the information submitted.

(4) Domicile may be inferred from the student's permanent address, parent's mailing address, or location of high school of graduation.

(5) Marriage to an independent person domiciled in and who is a resident of Kentucky shall be a factor considered by an institution in determining whether a student is dependent or independent.

(6) Financial assistance from, or a loan made by, a parent or family member other than an independent spouse, if used for sustenance of the student:

(a) Shall not be considered in establishing a student as independent; and

(b) Shall be a factor in establishing that a student is dependent.

Section 6. Effect of a Determination of Dependent Status on a Determination of Residency Status.

(1) The effect of a determination that a person is dependent shall be:

(a) The domicile and residency of a dependent person shall be the same as either parent. The domicile and residency of the parent shall be determined in the same manner as the domicile and residency of an independent person; and

(b) The domicile and residency of a dependent person whose parents are divorced, separated, or otherwise living apart shall be Kentucky if either parent is domiciled in and is a resident of Kentucky, regardless of which parent has legal custody or is entitled to claim that person as a dependent pursuant to federal or Kentucky income tax provisions.

(2) If the parent or parents of a dependent person are Kentucky residents and are domiciled in Kentucky, but subsequently move from the state:

(a) The dependent person shall be considered a resident of Kentucky while in continuous enrollment at the degree level in which currently enrolled; and

(b) The dependent person's residency status shall be reassessed if continuous enrollment is broken or the current degree level is completed.

Section 7. Member or Former Member of Armed Forces of the United States, Spouse and Dependents; Effect on a Determination of Residency Status.

(1) A member, spouse, or dependent of a member whose domicile and residency was Kentucky when inducted into the Armed Forces of the United States, and who maintains Kentucky as home of record and permanent address, shall be entitled to Kentucky residency status:

(a) During the member's time of active service; or

(b) If the member returns to this state within six (6) months of the date of the member's discharge from active duty.

(2) (a) A member of the armed services on active duty for more than thirty (30) days and who has a permanent duty station in Kentucky shall be classified as a Kentucky resident and shall be entitled to in-state tuition, as shall the spouse or a dependent child of the member.

(b) A member, spouse, or dependent of a member shall not lose Kentucky residency status if the member is transferred on military orders while the member, spouse, or dependent requesting the status is in continuous enrollment at the degree level in which currently enrolled.

(3) Membership in the National Guard or civilian employment at a military base alone shall not qualify a person for Kentucky residency status under the provisions of subsections (1) and (2) of this section. If a member of the Kentucky National Guard is on active duty status for a period of not less than thirty (30) days, the member shall be considered a Kentucky resident, as shall the spouse or a dependent child of the member.

(4) A person eligible for benefits under the federal Post-9/11 Veterans Educational Assistance Act of 2008, 38 U.S.C. 3301-3325, or any other educational benefits provided under Title 38 of the United States Code shall be entitled to Kentucky resident status for purposes of tuition charged at state-supported institutions.

(5) A person's residency status established pursuant to this section shall be reassessed if the qualifying condition is terminated.

Section 8. Status of Nonresident Aliens; Visas and Immigration.

(1) (a) A person holding a permanent residency visa or classified as a political refugee shall establish domicile and residency in the same manner as another person.

(b) Time spent in Kentucky and progress made in fulfilling the conditions of domicile and residency prior to obtaining permanent residency status shall be considered in establishing Kentucky domicile and residency.

(2) A person holding a nonimmigrant visa with designation A, E, G, H-1, H-4 if accompanying a person with an H-1 visa, I, K, L, N, R, shall establish domicile and residency the same as another person.

(3) (a) An independent person holding a nonimmigrant visa with designation B, C, D, F, H-2, H-3, H-4 if accompanying a person with an H-2 or H-3 visa, J, M, O, P, Q, S, TD, or TN shall not be classified as a Kentucky resident because that person does not have the capacity to remain in Kentucky indefinitely and therefore cannot form the requisite intent necessary to establish domicile as defined in Section 1(6) of this administrative regulation.

(b) A dependent person holding a visa as described in paragraph (a) of this subsection, but who is a dependent of a parent holding a visa as described in subsection (2) of this section, shall be considered as holding the visa of the parent.

(c) A dependent person holding a visa described in subsection (2) of this section or paragraph (a) of this subsection, if a parent is a citizen of the United States and is a resident of and domiciled in Kentucky, shall be a resident of Kentucky for the purposes of this administrative regulation.

(4) A person shall be a Kentucky resident for the purpose of this administrative regulation if the person graduated from a Kentucky high school and:

(a) Is an undocumented alien;

(b) Holds a visa listed in subsections (2) or (3)(a) of this section; or

(c) Is a dependent of a person who holds a visa listed in subsections (2) or (3)(a) of this section.

(5) (a) Except as provided in paragraph (b) of this subsection, a person who has petitioned the federal government to reclassify visa status shall continue to be ineligible until the petition has been granted by the federal government.

(b) A person who has petitioned the federal government to reclassify his or her visa status based on marriage to a Kentucky resident and who can demonstrate that the petition has been filed and acknowledged by the federal government, may establish Kentucky domicile and residency at that time.

Section 9. Beneficiaries of a Kentucky Educational Savings Plan Trust. A beneficiary of a Kentucky Educational Savings Plan Trust shall be granted residency status if the beneficiary meets the requirements of KRS 164A.330(6).

Section 10. Criteria Used in a Determination of Residency Status.

(1) (a) A determination of Kentucky domicile and residency shall be based upon verifiable circumstances or actions.

(b) A single fact shall not be paramount, and each situation shall be evaluated to identify those facts essential to the determination of domicile and residency.

(c) A person shall not be determined to be a Kentucky resident by the performance of an act that is incidental to fulfilling an educational purpose or by an act performed as a matter of convenience.

(d) Mere physical presence in Kentucky, including living with a relative or friend, shall not be sufficient evidence of domicile and residency.

(e) A student or prospective student shall respond to all requests for information regarding domicile or residency requested by an institution.

(2) The following facts, although not conclusive, shall have probative value in their entirety and shall be individually weighted, appropriate to the facts and circumstances in each determination of residency:

(a) Acceptance of an offer of full-time employment or transfer to an employer in Kentucky or contiguous area while maintaining residence and domicile in Kentucky;

(b) Continuous physical presence in Kentucky while in a nonstudent status for the twelve (12) months immediately preceding the start of the academic term for which a classification of Kentucky residency is sought;

(c) 1. Filing a Kentucky resident income tax return for the calendar year preceding the date of application for a change in residency status; or

2. Payment of Kentucky withholding taxes while employed during the calendar year for which a change in classification is sought;

(d) Full-time employment of at least one (1) year while living in Kentucky;

(e) Attendance as a full-time, nonresident student at an out-of-state institution based on a determination by that school that the person is a resident of Kentucky;

(f) Abandonment of a former domicile or residence and establishing domicile and residency in Kentucky with application to or attendance at an institution following and incidental to the change in domicile and residency;

(g) Obtaining licensing or certification for a professional and occupational purpose in Kentucky;

(h) Payment of real property taxes in Kentucky;

(i) Ownership of real property in Kentucky, if the property was used by the student as a residence preceding the date of application for a determination of residency status;

(j) Marriage of an independent student to a person who was domiciled in and a resident of Kentucky prior to the marriage; and

(k) The extent to which a student is dependent on student financial aid in order to provide basic sustenance.

(3) Except as provided in subsection (4) of this section, the following facts, because of the ease and convenience in completing them, shall have limited probative value in a determination that a person is domiciled in and is a resident of Kentucky:

(a) Kentucky automobile registration;

(b) Kentucky driver's license;

(c) Registration as a Kentucky voter;

(d) Long-term lease of at least twelve (12) consecutive months of noncollegiate housing; and

(e) Continued presence in Kentucky during academic breaks.

(4) The absence of a fact contained in subsection (3) of this section shall have significant probative value in determining that a student is not domiciled in or is not a resident of Kentucky.

Section 11. Effect of a Change in Circumstances on Residency Status.

(1) If a person becomes independent or if the residency status of a parent or parents of a dependent person changes, an institution shall reassess residency either upon a request by the student or a review initiated by the institution.

(2) Upon transfer to a Kentucky institution, a student's residency status shall be assessed by the receiving institution.

(3) A reconsideration of a determination of residency status for a dependent person shall be subject to the provisions for continuous enrollment, if applicable.

Section 12. Student Responsibilities.

(1) A student shall report under the proper residency classification, which includes the following actions:

(a) Raising a question concerning residency classification;

(b) Making application for change of residency classification with the designated office or person at the institution; and

(c) Notifying the designated office or person at the institution immediately upon a change in residency.

(2) If a student fails to notify an institutional official of a change in residency, an institutional official may investigate and evaluate the student's residency status.

(3) (a) If a student fails to provide, by the date specified by the institution, information required by an institution in a determination of residency status, the student shall be notified by the institution that the review has been canceled and that a determination has been made.

(b) Notification shall be made by registered mail, return receipt requested.

(c) Notification shall be made within ten (10) calendar days after the deadline for receipt of materials has passed.

(4) (a) The formal hearing conducted by an institution and the final recommended order shall be a final administrative action with no appeal to the Council on Postsecondary Education.

(b) A formal administrative hearing conducted by the Council on Postsecondary Education for residency determinations related to eligibility for the Academic Common Market and Regional Contract Programs shall be conducted pursuant to the provisions of KRS Chapter 13B and 13 KAR 2:070. The recommended order issued by the President of the Council shall be a final administrative action.

(5) A student shall not be entitled to appeal a determination of residency status if the determination made by an institution is because a student has failed to meet published deadlines for the submission of information as set forth in subsection (3) of this section. A student may request a review of a determination of residency status in a subsequent academic term.

Section 13. Institutional Responsibilities. Each institution shall:

(1) Provide for an administrative appeals process that includes a residency appeals officer to consider student appeals of an initial residency determination and which shall include a provision of fourteen (14) days for the student to appeal the residency appeals officer's determination;

(2) Establish a residency review committee to consider appeals of residency determinations by the residency appeals officer. The residency review committee

shall make a determination of student residency status and notify the student in writing within forty-five (45) days after receipt of the student appeal;

(3) Establish a formal hearing process as described in Section 14 of this administrative regulation; and

(4) Establish written policies and procedures for administering the responsibilities established in subsections (1), (2), and (3) of this section and that are:

(a) Approved by the institution's governing board;

(b) Made available to all students; and

(c) Filed with the council.

Section 14. Formal Institutional Hearing.

(1) A student who appeals a determination of residency by a residency review committee shall be granted a formal hearing by an institution if the request is made by a student in writing within fourteen (14) calendar days after notification of a determination by a residency review committee.

(2) If a request for a formal hearing is received, an institution shall appoint a hearing officer to conduct a formal hearing. The hearing officer shall:

(a) Be a person not involved in determinations of residency at an institution except for formal hearings; and

(b) Not be an employee in the same organizational unit as the residency appeals officer.

(3) An institution shall have written procedures for the conduct of a formal hearing that have been adopted by the board of trustees or regents, as appropriate, and that provide for:

(a) A hearing officer to make a recommendation on a residency appeal;

(b) Guarantees of due process to a student that include:

1. The right of a student to be represented by legal counsel; and

2. The right of a student to present information and to present testimony and information in support of a claim of Kentucky residency; and

(c) A recommendation to be issued by the hearing officer.

(4) An institution's formal hearing procedures shall be filed with the Council on Postsecondary Education and shall be available to a student requesting a formal hearing.

Section 15. Cost of Formal Hearings.

(1) An institution shall pay the cost for all residency determinations including the cost of a formal hearing.

(2) A student shall pay for the cost of all legal representation in support of the student's claim of residency.